# UNITED STATES COURT OF INTERNATIONAL TRADE

***Before*: The Honorable Jennifer Choe-Groves, Judge**

| | |
|---|---|
| PIRELLI TYRE CO., LTD., PIRELLI TYRE S.P.A., AND PIRELLI TIRE LLC, | ) ) ) |
| Plaintiffs, | ) ) |
| and | ) ) |
| SHANDONG NEW CONTINENT TIRE CO., LTD., | ) ) ) |
| v. | ) ) **Court No. 20-00115** |
| UNITED STATES, | ) ) **NONCONFIDENTIAL** |
| Defendant, | ) ) ) |
| and | ) ) |
| THE UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, | ) ) ) ) ) ) ) |
| Defendant-Intervenor. | ) ) |

## PLAINTIFFS BRIEF IN SUPPORT OF THEIR MOTION FOR JUDGMENT ON THE AGENCY RECORD

Daniel L. Porter
James P. Durling
James C. Beaty
Ana M. Amador Gil

**Curtis, Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 452-7373

July 8, 2022

**TABLE OF CONTENTS**

INTRODUCTION AND SUMMARY OF THE ARGUMENT .......................................... 1

STATEMENTS PURSUANT TO RULE 56.2 ..................................................... 6

A.   Administrative Determinations Under Appeal ......................................... 6

B.   Issues of Law Presented .......................................................... 6

C.   Statement of Reasons for Vacating Commerce's Final Determination .................. 6

STATEMENT PURSUANT TO USCIT RULE 44.1 ................................................ 7

STATEMENT OF FACTS ................................................................... 8

ARGUMENT ............................................................................. 12

I.    COMMERCE METHOD OF ANALYZING PIRELLI'S SEPARATE
      RATE APPLICATION WAS UNLAWFUL ............................................... 12

      A.   Commerce's Analysis of the Minority Ownership Share of Pirelli's
           SASAC-Controlled Entities Was Unlawful ................................ 14

      B.   Commerce's Control Theory is Inconsistent with the Jurisprudence
           of the Court ........................................................ 16

      C.   Commerce Failed to Establish Any Link to Pirelli's Export
           Activities in its Separate Rate Analysis ............................. 19

II.   COMMERCE'S DETERMINATION THAT PIRELLI FAILED TO
      REBUT THE PRESUMPTION OF GOVERNMENT CONTROL IS NOT
      SUPPORTED BY SUBSTANTIAL EVIDENCE ........................................... 23

      A.   Commerce's Finding that Pirelli's Shareholding Structure Allowed
           Chinese Owned Companies to Control Pirelli Tyre's Operational
           Activities Is Not Supported By Substantial Evidence .................. 25

           1.   Commerce failed to appreciate the significance of the undisputed
                facts that Pirelli Tyre, the applicant, was a separate corporate entity

from Pirelli Italy and that Chinese state-owned companies did not have majority ownership of Pirelli Italy during the POR ............... 25

2.  Contrary to Commerce's finding, the majority of members of Pirelli Italy's Board Of Directors are independent from the Chinese state-owned shareholders ........................................................................ 28

B.  Commerce's Conclusion That Chinese State-Owned Shareholders Chinese Government Exercised *De Facto* Operational Control Over Pirelli Ignores Substantial Evidence That Pirelli's Day-To-Day Management Was Insulated From Chinese Shareholder's Control ........... 32

1.  Contrary to Commerce's conclusion, substantial evidence demonstrates that Pirelli Italy's CEO, Mr. Marco Tronchetti Provera, had exclusive day-to-day management authority ............................ 34

2.  Upon the relisting of Pirelli Italy Chinese state-owned shareholders ceased to have management and coordination activity over Pirelli Italy ................................................................................................ 37

3.  As a publicly listed company, Pirelli-Italy was legally required under Italian law to maintain relative independence from its largest shareholders in order to protect the interest of minority shareholders ...................................................................................................... 40

4.  The above undisputed facts demonstrate that Commerce failed to demonstrate the required link between a Chinese state-owned company and an individual in a position to hire and fire the management of Pirelli Tyre, the applicant. ...................................... 41

C.  Commerce's Dismissal Of The Relevance of Italian Corporate Law Provisions Was Both Unlawful and Not Supported By Substantial Evidence ................................................................................................ 44

D.  Commerce's Conclusion That The Minority Chinese State-Owned Shareholder Could Influence Pirelli's *Export Activities* Is Completely Unsupported by Substantial Evidence ..................................... 46

CONCLUSION ............................................................................................. 50

# TABLE OF AUTHORITIES

**Cases**

*A. C. Aukerman Co. v. R. L. Chaides Constr. Co.*,
  960 F.2d 1020 (Fed. Cir. 1992) ..................................................... 18, 21, 22

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*,
  203 F. Supp. 3d 1256 (Ct. Int'l Trade 2017) ................................... 16

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*,
  284 F. Supp. 3d 1350 (Ct. Int'l Trade 2018) ................................... 17, 41

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962) ...................................................................... 21, 22

*China Mfrs. Alliance, LLC v. United States*,
  1 F.4th 1028 (Fed. Cir. 2021) ....................................................... 13

*Guizhou Tyre v. United States*,
  557 F. Supp. 3d 1302 (Ct. Int'l Trade 2022) ...................................passim

*Hontex Enters. Inc. v. United States*,
  248 F. Supp. 2d 1323 (Ct. Int'l Trade 2003) ................................... 45

*Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States*,
  28 F. Supp. 3d 1317 (Ct. Int'l Trade 2014) ..................................... 16, 27, 43

*Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*,
  519 F. Supp. 3d 1224 (Ct. Int'l Trade 2021) ................................... 46

*Nuove Industrie Elettriche Di Legnano S.p.A. v. United States*,
  739 F. Supp. 1567 (Ct. Int'l Trade 1990) ....................................... 44

*Qingdao Sentury Tire Co. v. United States*,
  539 F. Supp. 3d 1278 (Ct. Int'l Trade 2021) ................................... 26

*Securities Exchange Comm'n v. Chenery Corp.*,
  332 U.S. 194 (1947) ...................................................................... 21, 22

*Shandong Rongxin Imp. & Exp. Co. v. United States*,
  415 F. Supp. 3d 1319 (Ct. Int'l Trade 2019) ................................... 14

*Shandong Yongtai Grp. Co. v. United States*,
  487 F. Supp. 3d 1335 (Ct. Int'l Trade 2020) ................................... 26

*Sigma Corp. v. United States*,
  117 F.3d 1401 (Fed. Cir. 1997) ..................................................... 13

*Yantai CMC Bearing Co. v. United States*,
  203 F. Supp. 3d 1317 (Ct. Int'l Trade 2017) ................................... 15, 18

*Zhejiang Mach. Imp. & Exp. Corp. v. United States*,

521 F. Supp. 3d 1345 (Ct. Int'l Trade 2021) ..................................................... 18

*Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*,
    350 F. Supp. 3d 1308 (Ct. Int'l Trade 2018) ................................ 14, 18, 24, 27

## Administrative Decisions

*Diamond Sawblades and Parts Thereof from the People's Republic of China: Final
Results of Antidumping Duty Administrative Review; 2011-2012*,
79 FR 35723 (June 24, 2014) ............................................................................ 12

*Diamond Sawblades and Parts Thereof from the People's Republic of China:
Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*,
78 Fed. Reg. 77,098 (December 20, 2013) ......................................................... 12

*Silicon Carbide from the People's Republic of China: Final Determination of Sales at
Less Than Fair Value,* 59 Fed. Reg. 22,585 (May 2, 1994) .............................. 12

*Sparklers from the People's Republic of China: Final Determination of Sales at Less than
Fair Value* 56 Fed. Reg. 20,588, 20,589 (May 6, 1991) ................................... 12

## Other Authorities

Article 113-ter, Italian Consolidated Law on Financial Intermediation ........................... 39

Article 147-ter, Italian Consolidated Law on Financial Intermediation ................. 4, 23, 29

Article 148, Italian Consolidated Law on Financial Intermediation ......................... passim

Article 2391-bis, Italian Civil Code ............................................................................. 5, 23

Article 2497- Italian Civil Code .................................................................................... 38

Article 3 Principle 3.P.2, Italian Corporate Governance Code .......................................... 29

Article 4, CONSOB Regulation no. 17221/2010 ..................................................... 5, 23, 40

Article 7, CONSOB Regulation no. 17221/2010 ............................................................. 40

Article 8, CONSOB Regulation no. 17221/2010 ............................................................. 40

Article 92, Italian Consolidated Law on Financial Intermediation ........................ 5, 23, 39

Policy Bulletin 05.1, International Trade Administration ......................................... passim

## Rules

Rule 44.1, U.S. Court of International Trade Rules ..................................................... 7, 44

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

This appeal challenges the final determination by the Department of Commerce (hereinafter "Commerce" or " Department") to assign Pirelli Tyre Co., Ltd. (hereinafter "Pirelli Tyre") the "PRC-wide entity" antidumping ("AD") assessment and cash deposit rate of 79.46% instead of the AD rate for separate rate respondents of 0.00% in the 2017-2018 review of the AD order on Passenger Vehicle and Light Truck Tires ("PVLT") from the People's Republic of China ("POR3").   This Commerce determination was based on Commerce's conclusion that Pirelli Tyre was not eligible for "separate rate" status because, according to Commerce, the ownership of a <u>minority</u> equity interest in Pirelli Tyre's holding company, Pirelli & C. S.p.A. (hereinafter "Pirelli Italy") was indirectly held by State-owned Assets Supervision and Administration Commission of the State Counsel ("SASAC")-supervised companies caused Pirelli Tyre to fail Commerce's *de facto* control test.  Specifically, Commerce found that the indirectly held minority share allowed SASAC-controlled entities to influence the selection of management at Pirelli Tyre.  We demonstrate in the argument sections below how and why Commerce's determination unsupported by substantial evidence and otherwise contrary to law.

We note that in this brief we have used the designation "**Pirelli Tyre**" as a short-hand reference for "Pirelli Tyre Co., Ltd.", which was the specific exporter company making the separate rate application in the underlying AD review.  And we have used the designation "**Pirelli USA**" to refer to "Pirelli Tire LLC", which was the affiliated U.S. importer that undertook the U.S. sales subject to review.  We have used **"Pirelli Italy"** to refer to Pirelli & C. S.p.A., the holding company of the separate rate applicant.  Finally,

the collection of entities that constitute the plaintiffs in this proceeding, *i.e.* Pirelli Tyre, Pirelli USA, and Pirelli Tyre SpA, are referred to collectively as the "**Pirelli Companies**".

Please find below a summary of the arguments:

**Section I – Unlawful Commerce analysis of Pirelli's circumstances**

In Section I we demonstrate how this Court can find that Commerce's conclusion regarding Pirelli Tyre's eligibility for a separate rate is "otherwise unlawful" even before addressing the record evidence. Commerce's approach and analysis of the core issue itself failed to adhere to substantial precedents of this court.  Commerce failed to properly apply the applicable legal criteria for analyzing separate rate eligibility with regard to Pirelli Tyre.

First, Commerce's analysis of the <u>minority</u> ownership owned by the SASAC-supervised shareholders was unlawful.  Multiple precedents of the Trade Court indicate that the degree of ownership by Chinese state-owned shareholders is a key consideration for Commerce's analysis.  The clear import of these findings is that minority ownership by a government-controlled entity, as is the case here, requires a lower burden of proof. However, in its analysis of the case at hand, Commerce did not adopt such approach and applied the higher standard of proof that the Trade Court has authorized for situations of <u>majority</u> government ownership. This misapplication was legal error.

Second, the control theory that Commerce applied to Pirelli Tyre is inconsistent with the jurisprudence of the Trade Court.  The Trade Court has ruled that, although

Commerce may employ a "beholden theory" to support reach a conclusion regarding separate rate eligibility (*i.e.* by virtue of being an employee of a governmental entity the employee will exert control at the behest of the government), the theory <u>must be linked to specific evidence in the record</u> demonstrating a direct line between the government of China and an individual working at the applicant company with the ability to hire and fire the management. *Vis-à-vis* its analysis of Pirelli Tyre, Commerce did not comply with this Trade Court precedent.

Third, the Trade Court has consistently ruled that Commerce must give meaning to the words "export activities" in Commerce's discussion of its separate rate test. Indeed, in a recent case, the Trade Court has faulted Commerce for failing to link its separate rate analysis to the underlying export activities of the applicant. *See Guizhou Tyre v. United States*, 557 F. Supp. 3d 1302, 1326 (Ct. Int'l Trade 2022). In its analysis of Pirelli Tyre, Commerce did not do so. For these reasons, Commerce's determination regarding Pirelli Tyre's separate rate eligibility is inconsistent with the law.

**Section II – Absence of substantial evidence of Chinese government control**

In Section II we explain in great detail why Commerce's conclusion that the Chinese government controls Pirelli Tyre's export activities is not true and, therefore, cannot be supported by substantial evidence. We demonstrate that Commerce's conclusion that the Chinese government exercised *de facto* control over Pirelli Tyre's day-to-day operations is not true nor grounded upon any actual evidence in the record. The record evidence on this point leads to the exact opposite conclusion and Commerce's

failure to address contrary evidence means its determination cannot be supported by substantial evidence.

Pirelli made a similar argument in the appeal of Commerce's 2015-2016 AD ("POR1") review determination. This Court ultimately upheld Commerce's remand determination in that case, but the relevant facts and circumstances are quite different in POR3 as compared to POR1. The underlying evidentiary record from POR3 is very different from the POR1 evidentiary record and this Court should find that Commerce's POR3 AD review determination is not supported by substantial evidence, notwithstanding this Court's earlier conclusions *vis-à-vis* Commerce's POR1 AD review determination.  The records are distinct and require separate analysis. The different evidentiary record for the POR3 AD review demonstrates as follows:

- Pirelli Tyre, the separate rate applicant, was a separate corporate entity from Pirelli Italy

- The SASAC-supervised shareholders only had minority indirect ownership of Pirelli Italy during most of POR3;

- The majority of the Board of Directors of Pirelli Italy were <u>independent</u> directors who had special legal obligations under Italian law. *See* Articles 147-ter par. 4 and Article 148 of the Testo unico delle disposizioni in materia di intermediazione finanziaria ("TUF" - Italian Consolidated Law on Financial Intermediation), provided as Attachment I.

- Pirelli Italy's CEO, Mr. Marco Tronchetti Provera, had exclusive day-to-day management authority;

- Upon the relisting of Pirelli Italy (which occurred in October 2017), Chinese state-owned shareholders ceased to have management and coordination activity over Pirelli Italy;

- According to Italian law, as a publicly listed company, Pirelli Italy has to adopt and implement procedures to guarantee fairness of any transaction with the largest

shareholders. Moreover, Pirelli Italy is not under management and coordination activities of its largest shareholders, so the management is free to act according to the Pirelli Italy strategies. *See* Article 2391-bis of the Codice Civile Italiano ("Italian Civil Code") and Article 4, par. 1 of the Regulation containing provisions relating to transactions with related parties (adopted by the Market Supervisory Authority ("CONSOB") with Resolution no. 17221 of 12 March 2010) ("CONSOB Regulation no. 17221/2010"), provided in Attachment I. Lastly, Pirelli Italy has to maintain an equal treatment with all the shareholders also referring to the information granted. *See* Article 92 TUF provided in Attachment I.

- The legal protections in Italian corporate law (such as related parties transaction regulation or market abuse regulation)  prevent the very type of undue influence that Commerce has inferred. *See* Article 2391-bis of the Italian Civil  Code and Article 4, par. 1 of CONSOB Regulation no. 17221/2010.

- There is no evidence whatsoever that the Chinese Government exercised *de facto* control over Pirelli Tyre's export activities; in fact, all the record evidence demonstrates the contrary.

Taken together, these facts demonstrate that Commerce's determination that Pirelli Tyre failed to rebut the presumption of government control is not supported by substantial evidence.

## STATEMENTS PURSUANT TO RULE 56.2

**A.      Administrative Determinations Under Appeal**

Pirelli Tyre Co., Ltd., Pirelli Tyre S.p.A., and Pirelli Tire LLC seek judicial review of the Department of Commerce's ("Commerce") final determination in its administrative review of the antidumping duty order on certain passenger vehicle and light truck tires from the People's Republic of China for the period of review August 1, 2017 through July 31, 2018 ("POR 3"). *See Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review*; 2017-2018, 85 Fed. Reg. 22,396 (April 22, 2020) ("*Final Results*") and the accompanying Issues and Decisions Memorandum ("Final IDM").[1] (Public Record ("P.R.") 226).

**B.      Issues of Law Presented**

- Whether Commerce's method of analyzing Pirelli Tyre's separate rate application was not in accordance with law.

- Whether Commerce's conclusion that Pirelli Tyre was controlled by the Chinese Government through minority ownership by SASAC-supervised shareholders is not supported by substantial evidence and otherwise not in accordance with law.

**C.      Statement of Reasons for Vacating Commerce's Final Determination**

Commerce's AD determination should be vacated because it is not in accordance with law and is not supported by substantial evidence. The reasons are set forth in detail below.

---

[1] Certain other conclusions are contained in a separate proprietary memorandum addressing Pirelli's separate rate status. *See* Commerce's Separate Rate Memorandum (Apr. 15, 2020) (P.R. 228 and Confidential Record ("C.R.") 160).

## STATEMENT PURSUANT TO USCIT RULE 44.1

Pursuant to USCIT Rule 44.1, the Pirelli Companies hereby provide notice of its intent to raise legal issues under the laws of the Republic of Italy.  Specifically, as set forth in this brief, the Pirelli Companies intend to raise certain issues related to Italian Corporate law codified in the Italian Civil Code and the Italian Consolidated Law on Financial Intermediation ("TUF").  The referenced legal provisions are provided in Attachment 1 to this brief and include both the original Italian and an English translation that is publicly available.  These provisions are referenced in the arguments below.

## STATEMENT OF FACTS

We set forth below the key events in the progression of the underlying Commerce AD review and in this court action to date.

**Commerce's POR3 AD Review**

On August 7, 2018, Commerce notified interested parties of the opportunity to request an administrative review of AD order on PVLT Tires from China for POR 3. *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review*, 83 Fed. Reg. 38,682 (Aug. 7, 2018) (P.R.2).

On August 30, 2018, Pirelli Tyre requested an administrative review of itself. *See* Letter on Behalf of Pirelli regarding Request for Administrative Review (Aug. 30, 2019) (P.R. 8).

In October 2018, Commerce initiated the administrative review of Pirelli Tyre. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 83 Fed. Reg. 50,077 (Oct. 4, 2018) (P.R.170).

Pursuant to Commerce's instruction in the initiation notice, on November 14, 2018, Pirelli Tyre timely submitted a separate rate application, which contained detailed information and supporting documentation regarding Pirelli Tyre's corporate structure during the POR3 time period, the relevant Italian laws and regulations governing its operation, and its price negotiation and export sale practices to demonstrate its independence from the Chinese government, in law and in fact, with respect to exports

and thus its eligibility for the separate rate status.  *See* Letter on Behalf of Pirelli regarding Separate Rate Application (Nov. 14, 2019) ("Pirelli's SRA") (P.R. 89, C.R.35).

On October 18, 2019, Commerce published in the *Federal Register* the preliminary results of its  2017-2018 (POR3) AD review.  *See Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Rescission, in Part; 2017-2018*, 84 Fed. Reg. 55,909  (Oct. 18, 2019) ("Preliminary Results") (P.R. 194).  In its Preliminary Results, Commerce concluded that Pirelli Tyre was not eligible for the separate rate status.  *Id.* at 55,912 (P.R. 194).

On December 3, 2019, Pirelli Tyre submitted a case brief in the contested proceeding, urging Commerce to reverse its preliminary denial of separate rate status.  Case Brief on Behalf of Pirelli (Dec. 3, 2019) ("Pirelli's Case Brief") (P.R. 210).

On April 15, 2020, Commerce published the final administrative review results, accompanied by the Final IDM containing the legal and factual analysis underlying its determination.  *See Final  Results,* 85 Fed. Reg. 22,396 (P.R. 227).  In its Final Results, Commerce again concluded that Pirelli Tyre was not eligible for a separate rate because "Pirelli has not demonstrated on this record that Chem China no longer retains actual or potential control and influence throughout the Pirelli companies' ownership structure . . . and management, including Pirelli China's board and management".  Final IDM at 17-18 (P.R. 226).

As a result, Commerce assigned the China-wide entity rate of 76.46 percent to Pirelli Tyre for purposes of liquidating suspended Pirelli's entries during the period of

review and collecting cash deposit moving forward, instead of the 0.00 percent AD rate assigned to separate rate respondents. *See Final Results,* 85 Fed. Reg. at 22,398 (P.R. 227).

**This Court Action**

On May 21, 2020, plaintiffs, the Pirelli Companies, initiated a court appeal challenging Commerce POR3 final AD review determination by filing a Summons and Complaint. Summons, ECF No. 1 (May 21, 2020); Complaint, ECF No. 6 (May 21, 2020).

On July 27, 2020 the Pirelli Companies filed an unopposed Motion to Stay this court proceeding until a final and conclusive disposition was rendered in a separate court case then on appeal to the Court of Appeals for the Federal Circuit ("Federal Circuit"): *China Manufacturers Alliance, LLC v. United States*, Fed. Cir. Ct. No. 2020-1159 ("*CMA*"). Motion to Stay, ECF No. 23 (July 27, 2020). This Court granted the motion for stay on August 6, 2020. Order Granting Stay, ECF No. 25 (Aug. 6, 2020).

The Federal Circuit issued its decision *CMA* case in June 2021. *China Mfrs. Alliance, LLC v. United States*, 1 F.4th 1028, 1039 (Fed. Cir. 2021).

In July 2021, Defendant United States filed a motion to lift the stay in order that this Court undertake a "voluntary remand" to return this case to Commerce. Motion for Remand and to Lift Stay, ECF No. 29 (July 20, 2021). The primary reason that Defendant gave for seeking a voluntary remand was that such remand was the only way for Defendant to combat the alleged malfeasance of completely different and unrelated Chinese respondent company. *Id.* In September 2021, this Court granted Defendant's

Motion and remanded the case back to Commerce.  Order Granting Motion for Remand

and to Lift Stay, ECF No. 37 (Sept. 20, 2021).

In April 2022, Commerce submitted its Remand Results to this Court.

Confidential Remand Results, ECF No. 55 (Apr. 28, 2022); Public Remand Results, ECF

No. 56 (Apr. 28, 2022).  In its Remand Results, Commerce concluded that there was no

justification to change the antidumping rate assigned to separate rate companies in

Commerce's POR3 AD review determination.  *See* Public Remand Results at 24, (ECF

No. 56).  As such, the issues raised with respect to Pirelli Tyre's separate rate eligibility

are unchanged since the Final Results of the challenged administrative proceeding.

**ARGUMENT**

I.   **COMMERCE METHOD OF ANALYZING PIRELLI'S SEPARATE RATE APPLICATION WAS UNLAWFUL**

In the section below, we demonstrate why Commerce's conclusion that the Chinese Government controlled Pirelli Tyre's export activities, and therefore Pirelli Tyre should be denied separate rate eligibility, is not supported by substantial evidence.  In this section, we demonstrate how this Court can find that Commerce's conclusion is "otherwise unlawful" even before assessing whether Commerce's decision was supported by substantial evidence because Commerce's approach and analysis of the core issue itself failed to adhere to substantial precedent of this court.  As detailed below, Commerce failed to properly apply the applicable legal criteria for analyzing separate rate eligibility with regard to Pirelli.

In analyzing separate rate eligibility in the context of an NME proceeding, Commerce has stated that it relies on a multi-factor test born of certain administrative decisions[2] and encapsulated in Policy Bulletin 05.1.  With respect to *de facto* control, Policy Bulletin 05.1 states as follows:

---

[2] *See* Final IDM at 14 note 71 (citing *Final Determination of Sales at Less than Fair Value: Sparklers from the People's Republic of China*, 56 Fed. Reg. 20,588, 20,589 (May 6, 1991); *Notice of Final Determination of Sales at Less Than Fair Value: Silicon Carbide from the People's Republic of China*, 59 Fed. Reg. 22,585 (May 2, 1994); *Diamond Sawblades and Parts Thereof from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 78 Fed. Reg. 77,098 (December 20, 2013), and accompanying PDM at 7, unchanged in *Diamond Sawblades and Parts Thereof from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 35723 (June 24, 2014), and accompanying IDM at Comment 1) (P.R. 226).

Typically, the Department considers four factors in evaluating whether each respondent is subject to de facto governmental control of its export functions:

> 1) whether the export prices are set by, or subject to the approval of, a governmental authority;
>
> 2) whether the respondent has authority to negotiate and sign contracts and other agreements;
>
> 3) whether the respondent has autonomy from the central, provincial and local governments in making decisions regarding the selection of its management; and
>
> 4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.

Policy Bulletin 05.1 (formatting adjusted for clarity).  Failure to provide evidence demonstrating any of these criteria will result in a denial of a separate rate application.  In evaluating these substantive criteria, Commerce applies a rebuttable presumption that an applicant is state-controlled.  Final IDM at 19 ("Commerce has a long-standing rebuttable presumption that, unless otherwise demonstrated, the export activities of all firms in China are subject to government control and influence.") (P.R. 226); *see also Sigma Corp. v. United States*, 117 F.3d 1401, 1405 (Fed. Cir. 1997) ("We agree with the government that it was within Commerce's authority to employ a presumption of state control for exporters in a nonmarket economy, and to place the burden on the exporters to demonstrate an absence of central government control.").

In numerous cases, the courts have considered various aspects of this test. Importantly, the Federal Circuit has recently ruled that Commerce does in fact have the authority to apply a "China-Wide Rate" under the statute.  *China Mfrs. Alliance, LLC v. United States*, 1 F.4th 1028, 1039 (Fed. Cir. 2021).  The application of the separate rate

test detailed in Policy Bulletin, however, has been questioned in various Trade Court decisions.  Those cases have crafted important guardrails for Commerce's separate rate analysis.  In particular, in cases where the applicant has a minority state-controlled owner, (i) the evidentiary burden is lower than if the share were majority ownership, (ii) the evidence relied on must demonstrate actual control not merely potential control, and (iii) Commerce's findings must link to the applicants actual export activities.  Here, Commerce ignored all of these guardrails and made a determination that is contrary to law.

A.    Commerce's Analysis of the Minority Ownership Share of Pirelli's SASAC-Controlled Entities Was Unlawful

Of particular relevance to this case is Commerce's differing approach to situations where the source of potential government control is majority ownership by a government-controlled entity and situations where government-controlled entities hold only a minority share.  The Trade Court, in considering Commerce past practice, has consistently observed that it is lawful for Commerce to impose a high burden of proof on respondents seeking a separate rate in situations where a government-controlled entity has a direct or indirect majority interest.  *Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F. Supp. 3d 1308, 1323 (Ct. Int'l Trade 2018).  In *Shandong Roixin v. United States*, the Court similarly identified a differing, higher, standard of proof in situations where there was majority shareholding by a government-controlled entity. *Shandong Rongxin Imp. & Exp. Co. v. United States*, 415 F. Supp. 3d 1319, 1322 (Ct. Int'l Trade 2019). In *Yantai CMC Bearing Co. v. United States*, the Court found that

majority shareholding alone could support a finding that an applicant was not eligible for a separate rate because of the high burden imposed on such applicants. *Yantai CMC Bearing Co. v. United States*, 203 F. Supp. 3d 1317, 1325-1326 (Ct. Int'l Trade 2017).

These decisions have an important corollary that <u>minority</u> ownership by a government-controlled entity, as is the case here, requires a lower burden of proof and it should be more likely that Commerce will grant a separate rate in those situations. That is not, however, what Commerce did in this review. Commerce admits that Pirelli Tyre is only minority-owned by a SASAC-controlled entity. Final IDM at 14 (P.R. 226). But Commerce applied the separate rate test in same manner it would for a majority-owned entity. Commerce applied a high burden of proof and found that the ability to nominate a subset of the board of directors of a completely separate company higher up in the corporate ladder necessarily resulted in Chinese government control of export pricing despite numerous facts presented by Pirelli Tyre demonstrating that Commerce's theory was baseless. This higher burden of proof approach, and using a single fact as the basis for government control, effectively precluding a separate rate simply makes no sense for a situation of minority ownership. Because the Court has endorsed a version of this test that has a lower standard of proof for minority-owned applicants, Commerce's failure to treat Pirelli Tyre in this way was unlawful and is grounds for remand.

**B.      Commerce's Control Theory is Inconsistent with the Jurisprudence of the Court**

The Court has also found that Commerce must focus on evidence of actual government control rather than the mere theoretical potential for control.  In *Jiangsu Jiasheng v. United States*, the Court upheld Commerce grant of a separate rate over a challenge premised on the idea that the ability to control the appointment of certain board members resulted in the ability to control management decisions.  *Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States*, 28 F. Supp. 3d 1317, 1348 (Ct. Int'l Trade 2014).  Specifically, the Court found unpersuasive the idea that "the potential for governmental control through such managers or board directors categorically precludes a finding that such companies in fact acted autonomously in conducting their own export activities."  *Id.*  The Court found that "these facts alone are not dispositive of the de facto autonomy inquiry, because they speak solely to the possibility for governmental control over export activities through these persons, not whether such control was in fact reasonably likely to have been exercised during the POI."  *Id.*

In *An Giang Fisheries v. United States*, the Court considered similar arguments and found that "Commerce's practice does not require a respondent to rebut the potential for government control, but rather actual control by the government entity."  *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 203 F. Supp. 3d 1256, 1289-1290 (Ct. Int'l Trade 2017).  The Court remanded the case with instruction to Commerce to "explain why it is reasonable to infer that the government has actual control over CASEAMEX's largest shareholder or explain why it is reasonable to infer government

NONCONFIDENTIAL

control over CASEAMEX without such evidence." *Id.* at 1294.  As a result of the

remand, Commerce revealed that it was relying on what the Court terms "Commerce's

beholden theory" (i.e. that by virtue of being an employee of a government entity, such

employee will exert control at the behest of that employer).  *An Giang Fisheries Imp. &*

*Exp. Joint Stock Co. v. United States*, 284 F. Supp. 3d 1350, 1362 (Ct. Int'l Trade 2018).

The Court found that this theory was a valid premise for finding control on the very

narrow basis that Commerce was able to identify a specific government employee with

the ability to hire and fire the individual employees of the applicant company.  *Id.* at

1364.

      There is no such factual link here.  [



      ]  Without that crucial factual link, the invocation of the beholden theory is

unlawful.  Since the record directly refutes Commerce's basis for finding control and

Commerce has stated it is relying on the presumption for its ultimate finding, this case

again raises the question of whether Commerce is using the presumption to substitute for

an analysis of record evidence, thus employing an irrebuttable presumption of

government control.

      The Courts have made clear that Commerce must not employ an irrebuttable

presumption of government control in the context of separate rate proceedings.  That is,

Commerce cannot substitute the presumption for an analysis of the underlying record.

Once evidence is brought forward that rebuts the presumption, Commerce cannot rely on

that presumption alone in making its findings.  The Federal Circuit has found that
rebutting a "presumption compels the production of this minimum quantum of evidence
from the party against whom it operates, nothing more" and that once that evidence is
proffered "a presumption is not merely rebuttable but completely vanishes upon the
introduction of evidence sufficient to support a finding of the nonexistence of the
presumed fact."  *A. C. Aukerman Co. v. R. L. Chaides Constr. Co.*, 960 F.2d 1020, 1037
(Fed. Cir. 1992).

 The Court of International Trade has consistently confirmed that Commerce's
presumption of government control is rebuttable in challenges that allege it has been
construed as irrebuttable.  *See, e.g.*, *Zhejiang Mach. Imp. & Exp. Corp. v. United States*,
521 F. Supp. 3d 1345, 1352 (Ct. Int'l Trade 2021); *Yantai CMC*, 203 F. Supp. 3d 1317,
1326; *Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F. Supp. 3d
1308, 1323 (Ct. Int'l Trade 2018).  Implicit in these decisions, however, is the necessary
conclusion that if the test were applied effectively as an irrebuttable presumption, such an
approach by Commerce would be unlawful.

 Indeed, Senior Judge Stanceu has specifically raised this issue in the *Guizhou Tyre*
case. He observed that Commerce has not performed a rulemaking regarding its separate
rate test generally or the issue of minority versus majority board composition specifically.
*Guizhou Tyre*, 557 F. Supp. 3d at 1326.  In the context of that specific case, Senior Judge
Stanceu was critical of Commerce's approach stating that "{i}n the absence of such a
rule, it is possible to construe . . . {Commerce's} current practice {concerning}

government control of selection of board and management is, in effect, an irrebuttable presumption of control of export activities".  *Guizhou Tyre*, 557 F. Supp. 3d at 1326.

This ruling stands for the proposition that the application of Commerce's presumption of control in a way that renders it irrebuttable would be inherently unlawful. Commerce's conduct in this review, however, strongly suggests that it is treating the presumption of government control in separate rate proceedings as some parallel process that falls outside of the substantial evidence paradigm established in 19 U.S.C. §1516a. To the extent that Commerce's practice results in something less than substantial evidence review, it is inherently unlawful.  In this case, these concerns are especially poignant, given the robust factual evidence demonstrating a lack of control, and this Court must remand this determination with instructions for Commerce to clarify this key legal point.

### C.    Commerce Failed to Establish Any Link to Pirelli's Export Activities in its Separate Rate Analysis

The Court has consistently ruled that Commerce must give meaning to the words "export activities" in Commerce's discussion of its separate rate test.  In its analysis of Pirelli Tyre's separate rate application, Commerce did not do so.  The structure of Pirelli Tyre's corporate ownership and its sales architecture both affirmatively demonstrate that the source of Commerce's control theory, minority ownership by a SASAC-supervised entity of Pirelli Tyre's corporate parent, has no role in or ability to impact Pirelli Tyre's export activities.

In a recent case, the Court has specifically faulted Commerce for failing to link its separate rate analysis to the underlying export activities of the applicant.  In *Guizhou Tyre v. United States*, the Court remanded Commerce's decision to deny an applicant a separate rate because "{Commerce's} analysis fails to clarify or explain whether its finding of government control extended, specifically, to {the applicant's} export activities during the period of investigation."  *Guizhou Tyre Co. v. United States*, 557 F. Supp. 3d 1302, 1319 (Ct. Int'l Trade 2022).  Further, the Court noted that the applicant had rebutted the presumption of control with respect to its export activities by submitting affirmative evidence regarding its export pricing and that the evidence "put forward was sufficient to require Commerce to consider the record as a whole and make a factual determination on whether the Chinese government actually controlled {the applicant's} export functions and export pricing decisions during the period of investigation."  *Id.* at 1320.

As detailed further below, the facts of this case show that Pirelli Tyre relies on a U.S. distribution network for its export sales that is totally unaddressed in Commerce's determination.  The crux of Commerce's finding is that the ability of a minority shareholder in Pirelli Italy to influence the managers at Pirelli Tyre in a way that artificially depresses export prices is completely incompatible with a corporate arrangement where export prices are negotiated by a U.S. company.  In that scenario, there is no link between export prices and a SASAC-supervised entity.  Without that crucial link, Commerce cannot, lawfully, continue to find that Pirelli Tyre failed the

separate rate test as the link to export activities is a required element of the test under

Commerce's stated practice.

In conclusion,

> (i)    when Commerce employs its separate rate test it must consider whether the state-ownership is majority or minority and apply a lower standard of evidence to situations where the ownership share is only a minority;

> (ii)    Commerce may employ a "beholden theory" but its theory must be linked to specific evidence supporting such a theory; and

> (iii)    there must be a connection between the Commerce's findings and the export activities of the applicant.

In performing this analysis, Commerce must actually apply a <u>rebuttable</u> presumption of government control.  That is, once the "minimum quantum of evidence" rebutting the presumption is proffered, Commerce may no longer rely solely on the presumption.  *A. C. Aukerman*, 960 F.2d at 1037.  Yet, Commerce's decision memorandum makes clear that the presumption is the entire basis for its decision in this review.  Final IDM at 13 (P.R. 226); *see also Securities Exchange Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (in reviewing agency action Courts "must judge the propriety of such action solely by the grounds invoked by the agency."); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962) (holding that a court is obligated to review a decision of an administrative agency according to the reasoning the agency puts forth).  As a result, Commerce's determination is unlawful and must be remanded to Commerce to demonstrate how its findings regarding control are linked to Pirelli Tyre's export activities.

## II.   COMMERCE'S DETERMINATION THAT PIRELLI FAILED TO REBUT THE PRESUMPTION OF GOVERNMENT CONTROL IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

In the final decision memorandum, Commerce states that "{w}e have not granted a separate rate to Pirelli Tyre for these final results because it has not rebutted the presumption of *de facto* government control." Final IDM at 13 (P.R. 226).  In its analysis, Commerce relies on "*de facto* criterion (3), i.e., that control over Pirelli's selection of management exists through SASAC entity CNRC." Final IDM at 14 (P.R. 226). It is the role of this Court to consider whether, in light of the administrative record, Commerce's finding that Pirelli Tyre had not rebutted the presumption of *de facto* government control was supported by substantial evidence.  *See Securities Exchange Comm'n v. Chenery Corp.*, 332 U.S. at 196; *see also Burlington Truck Lines, Inc. v. United States*, 371 U.S. at 168–69.

Consistent with the jurisprudence in this circuit, Commerce continued reliance on the presumption is only appropriate if Pirelli truly failed to adduce the "minimum quantum of evidence" demonstrating that Pirelli was not controlled by the government of China.  *A.C. Aukerman Co.,* 960 F.2d at 1037.  Thus, Commerce's findings can only be supported by substantial evidence if this Court finds that Pirelli did not proffer the minimum quantum of evidence.  But, as Pirelli details more fully below, that the administrative record before Commerce, in fact, contains such evidence to rebut the presumption and thus the presumption has "completely vanishe{d}." *Id.*  As a result, any determination by Commerce premised on the continued existence of a presumption is

presumptively wrong as it would as a matter of law fail to rise to the standard of

substantial evidence.  *See* 19 U.S.C. § 1516a(b)(1)(B)(i).

The key facts that this Court must consider in analyzing whether the presumption

has been extinguished are as follows:

- Pirelli Tyre, the applicant, was a separate corporate entity from Pirelli Italy

- The SASAC-supervised shareholders only had minority ownership of Pirelli Italy during the POR;

- The majority of the Board of Directors of Pirelli-Italy were <u>independent</u> directors; *See* Articles 147-ter par. 4 and Article 148 of TUF, provided as Attachment I.

- Pirelli-Italy's articles of association ensured that CEO, Mr. Marco Tronchetti Provera, had exclusive day-to-day management authority;

- Upon the relisting of Pirelli Italy, any management and coordination activity over the same from any of its shareholders formally ceased to be effective;

- As a publicly listed company, Pirelli Italy has to adopt and implement procedures to guarantee fairness of any transaction with the largest shareholders. Moreover, Pirelli Italy is not under management and coordination activities of its largest shareholders, so the management is free to act according to the Pirelli Italy strategies. *See* Article 2391-bis of the Italian Civil  Code and Article 4, par. 1 of CONSOB Regulation no. 17221/2010 provided in Attachment I. Lastly, Pirelli Italy has to maintain an equal treatment with all the shareholders also referring to the information granted. *See* Article 92 TUF provided in Attachment I.

- The legal protections in Italian corporate law prevent the very type of undue influence that Commerce has inferred. *See* Article 2391-bis of the Italian Civil Code and Article 4, par. 1 of CONSOB Regulation no. 17221/2010, provided in Attachment I.

- There is no evidence whatsoever that the Chinese Government exercised de facto control over Pirelli Tyre's <u>export activities, which were and are totally independent</u> as clearly demonstrated by all the record evidence.

Taken together, these facts demonstrate that Pirelli Tyre operates freely and, crucially,

sets its export prices free from distortions and/or influences imposed by any arm of the

Government of China. Commerce did not seriously address this evidence and instead relied heavily on a presumption that had been rebutted.

**A.    Commerce's Finding that Pirelli's Shareholding Structure Allowed Chinese Owned Companies to Control Pirelli Tyre's Operational Activities Is Not Supported By Substantial Evidence**

**1.    Commerce failed to appreciate the significance of the undisputed facts that Pirelli Tyre, the applicant, was a separate corporate entity from Pirelli Italy and that Chinese state-owned companies did not have majority ownership of Pirelli Italy during the POR**

In rendering its ultimate conclusion, Commerce ignored that Pirelli China is a Sino-foreign joint venture established in China; and  Pirelli Italy, one of Pirelli China's indirect shareholders, is a separate Italian company.

The evidentiary record makes clear that Pirelli Tyre and Pirelli Italy remained separate legal entities during POR3.  *See, e.g.*, Pirelli's SRA at 13-27 (P.R. 89). In past decisions regarding separate rate eligibility, the court has found such facts to be particularly compelling and weighing in favor of finding independence.  *See Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F. Supp. 3d 1308 at 1318 (Ct. Int'l Trade 2018) ({e}vidence of legal separation between an exporter subject to the nonmarket economy presumption of government control and its parent company (and its parent's state-owned parent company) . . . may rebut the presumption of *de facto* control over management selection when the government holds a minority stake).

Such fact—separate corporate entities—is particularly important for the POR3 AD review given that, unlike in the POR1 AD review, Chinese state-owned companies did not have majority ownership of any Pirelli entity.  Indeed, in its Final Determination,

NONCONFIDENTIAL

Commerce itself fully acknowledges that during the majority of POR3, China National Chemical Corporation ("Chem China") and the Silk Road Fund, the two SASAC-supervised entities that were the source of Commerce's control theory, only had a minority shareholding in Pirelli Italy. Final IDM at 14 (P.R. 226). Commerce, however, fails to actually integrate this key fact into its analysis stating only that "{a} minority indirect ownership does not in and of itself mean an absence of government control." Final IDM at 15 (P.R. 226). Rather than recognize and address the importance of this key fact, Commerce essentially noted and then ignored it.

The evidentiary record shows that the [

] *See* Pirelli's SRA at Ex. 5 (C.R. 43). [

] Pirelli's SRA at 13, Ex. 5 (C.R. 35). [

] Pirelli's SRA at 13 (P.R. 89).

This fact was a crucial difference from Commerce's application of the China-Wide rate to the Pirelli Companies during POR1, when SASAC-supervised entities had majority ownership for most of the POR.[3] In assessing Commerce's POR1

_____

[3] Final Results of Redetermination Pursuant to Court Order, *Qingdao Sentury Tire Co., Ltd., Sentury Tire USA Inc., Sentury (Hong Kong) Trade Co., Limited, and Pirelli Tyre Co., Ltd., Pirelli Tyre S.p.A., and Pirelli Tire LLC v. United States*, Court No. 18-00079, Slip Op. 21-128 (September 24, 2021) (finding the Pirelli Tyre free from government control during the period preceding the acquisition of shares by Chem China) ("POR1 Remand Redetermination"), at 5-6

redetermination, this Court paid particular attention to the ownership structure stating that "Pirelli China was controlled and majority owned by Chinese government-owned entities; the acquisition of Pirelli's companies in Italy by {Chem China} gave rise to the presumption of government control of Pirelli China; and Chinese government-owned entities". *Shandong Yongtai Grp. Co. v. United States*, 487 F. Supp. 3d 1335, 1346 (Ct. Int'l Trade 2020)3w. Later, in assessing Commerce's Remand Redetermination, this Court again noted Commerce's basis for rejecting the application of a separate rate to Pirelli was the majority government shareholding. *See Qingdao Sentury Tire Co. v. United States*, 539 F. Supp. 3d 1278, 1281 (Ct. Int'l Trade 2021) ("Commerce examined the record and noted that Chinese government-owned entities had majority ownership of Pirelli.").

However, despite placing significant emphasis on shareholding during the POR1 AD review, in this POR3 AD review Commerce has not properly incorporated the fact of minority shareholding into its analysis. Essentially, Commerce has not adequately taken into account the fact that the POR3 AD review had very different facts concerning ownership of Pirelli Tyre from the period during POR1 in which it found Pirelli Tyre to be controlled by Chinese state-owned entities. Because the POR3 AD review facts about ownership were so different—a switch from majority to minority ownership—Commerce was under the obligation to perform a more probing review of the shareholding situation

---

("Consistent with the Court's remand order, our analysis for purposes of this final determination concerns Pirelli's separate rate eligibility during the period January 27, 2015, through October 19, 2015. . . Pirelli Tyre Co. was not wholly foreign owned during the period at issue. Therefore, Pirelli Tyre Co. is properly subject to a separate rate analysis.")

to ensure that its determination was supported by substantial evidence. *See Zhejiang Quzhou Lianzhou Refrigerants*, 350 F. Supp. 3d at 1318 ("Commerce views government ownership differently depending on whether the government is a majority or minority owner.").

Indeed, prior practice shows that, in instances of minority government ownership, both Commerce and the Court require a lower level of evidence to grant a separate rate. *See Jiangsu Jiasheng Photovoltaic Tech.*, 121 F. Supp. 3d at 1269 (rejecting argument that a twenty percent ownership interest should in itself constitute conclusive evidence of *de facto* government control).

Although Commerce acknowledges the minority stake held by SASAC-supervised entities in Pirelli Tyre in its Final Determination, Commerce's analysis treats this fact as inconsequential.  Commerce, however, was required to weight this key fact in its analysis and its failure to do so renders its determination unsupported by substantial evidence.

> **2.  Contrary to Commerce's finding, the majority of members of Pirelli Italy's Board Of Directors are independent from the Chinese state-owned shareholders**

Another key fact upon which Commerce relies for its conclusion of control of Pirelli by Chinese state-owned companies is the board composition of Pirelli Italy.  Final IDM at 15 (P.R. 226).  Commerce notes that "Pirelli's board is composed of 15 members, eight of whom are to be chosen by China National Tire & Rubber Corporation, Ltd." Separate Rate Memorandum at 2 (P.R. 228). In addition, Commerce noted that Mr. Ren Jianxin was Chairman of the Board at both Chem China and Pirelli Italy.  Final IDM at 15-16 (P.R. 226).  Commerce's statements convey the impression that the Chinese state-

NONCONFIDENTIAL

owned shareholders constituted and actively controlled the majority of Pirelli-Italy's

board members.  But such impression is just not true.  Indeed, it is contradicted by

substantial evidence in the administrative record.

[



]

*See* Pirelli's SRA at Ex. 10 ([                                                                ]) (P.R. 93).  [


]   *See* Pirelli's SRA at Ex. 16D (P.R. 93). The meaning of

"independent" is explained in Italian law, and it specifically requires that members of the

Board of Directors have no relationship with any shareholder, whether professional (self-

employment or employee), economic or personal that might compromise their

independence. *See* Article 148, par 3 TUF provided in Attachment I.

What is critical to understand (but which Commerce did not) is that the

independence of these eight directors is evaluated pursuant to Italian law requirements

and must be re-assessed on an annual basis. See Article 3 Principle 3.P.2 of Codice di

Corporate Governance ("Italian Code of Corporate Governance") provided in Attachment

I.  This fact was made clear in Pirelli Italy's 2017 Annual Report:

> At the Report Date, 50% of the Board of Directors consists of directors who satisfy the requirements for identification as independent:  . . . The existence of their independence requirements has been evaluated in the context of the Board meeting held on 31 August 2017, on the basis of the information provided by them at the time of their appointment, the information available to the Company and the requirements established in the TUF and recommended by the Corporate Governance Code.
>
> At the same time of the assessment made by the Board of Directors, the Board of Statutory Auditors confirmed that it had verified, in line with the recommendations of the Corporate Governance Code, the proper application of the assessment criteria and procedures adopted by the Board of Directors to verify the independence of its Directors.
>
> Following their appointment, the satisfaction of the independence requirements is assessed at least on an annual basis (for 2018, this activity was carried out during the Board meeting held on 26 February 2018).

Pirelli's SRA at Ex. 9 (2017 Annual Report at p. 215) (P.R. 91).

And so, the evidentiary record of this proceeding therefore makes crystal clear

that:

- a majority (8 out of 15) of Pirelli Italy's board members are independent directors. This is far beyond the requirements under Italian law, which directs companies to appoint at least "two" independent members of the Board of Directors in instances where it is composed by more than seven members. *See* Article 147-ter, par. 4 TUF. In addition, obligation of independence from the appointing shareholder is governed by Italian law concerning publicly listed companies. In case of not complying with the requirement of independence, the member of the Board is required to step down. *See* Article 148, par. 3 TUF.

- only 4 out of 15 board members are appointed by and represent CNRC's interests in Pirelli Italy's board;

- a majority (11 out of 15) of board members do not hold any positions with Chem China or CNRC;

**NONCONFIDENTIAL**

- none of the independent directors hold any positions with Chem China or CNRC; and

- only 6 out of 15 board members are Chinese nationals.

As such, Pirelli Italy's board membership <u>does not</u> support, but actually rebuts, the

Department's conclusion that Chinese state-owned companies controlled Pirelli Italy's

Board of Directors.

The composition of the Board of Directors following the re-listing of Pirelli Italy

is fundamentally different from the Board structure during the POR1 time period which

had majority ownership by SASAC-supervised entities.  [




                                                                                      ]

*See* Pirelli's SRA at Ex. 8 [

                                                              ]  (C.R. 44).

In the POR3 time period, when the ownership shifted from majority to minority

control, the minority representation on the Board had less power and less influence than

before.  Influence is not control.  A minority of the Board representing only minority

ownership cannot be considered "control" absent a very compelling explanation why.

And Commerce has not provided such explanation here.

NONCONFIDENTIAL

**B.**   **Commerce's Conclusion That Chinese State-Owned Shareholders Chinese Government Exercised *De Facto* Operational Control Over Pirelli Ignores Substantial Evidence That Pirelli's Day-To-Day Management Was Insulated From Chinese Shareholder's Control**

As explained above, Pirelli Italy, the indirect majority parent company of Pirelli Tyre,  is based in Italy and is publicly listed on the Milan Stock Exchange.  Commerce's ultimate decision denying Pirelli Tyre's separate rate application is premised upon Commerce's finding that the Chinese Government through Chinese state-owned shareholders controls Pirelli Italy's Board of Directors, thus controlling Pirelli Tyre's day-to-day operations.  However, this finding is simply contradicted by substantial evidence.  In fact, there is substantial evidence that the SASAC-supervised shareholders had no ability to control day-to-day management of Pirelli Italy much less its subsidiary, Pirelli Tyre, due to specific mechanisms  that were set forth in those documents governing the agreement among the shareholders and the operation of Pirelli Italy.

[

].  *See* Pirelli's SRA at Ex. 8 (Tab A) ([

]) (C.R. 44).

[

].  *See id.* at

Section 6 (IPO) (C.R. 44).  [

**NONCONFIDENTIAL**

].

[

]) (C.R. 44).

[

].

The Chinese state-owned company shareholders had no interest in exercising, and actually did not exercise, any influence in the management and operations of Pirelli Italy or the broader group.  *See* Pirelli SRA at 15 (P.R. 89).  Although some of these facts may be unchanged from POR1, the context has changed significantly. Because Chem China is now a minority shareholder, the powers of independent management and direction should have been duly considered in Commerce's decision, while they were not.

1.    **Contrary to Commerce's conclusion, substantial evidence demonstrates that Pirelli Italy's CEO, Mr. Marco Tronchetti Provera, had exclusive day-to-day management authority**

Perhaps the most egregious part of Commerce's analysis was  the failure to appreciate the significance of the fact that the Italian national CEO, Mr. Marco Tronchetti Provera, had full authority to appoint all operational management of Pirelli Italy.  While Commerce duly notes that the Board of Directors "delegated' authority to Mr. Tronchetti Provera in the management of Pirelli & C.S.p.A.'s," *see* Final IDM at 17 (P.R. 226), and that "Mr. Provera is charged with implementing Pirelli & C.S.p.A.'s business plan and budget, " *see* Final IDM at 17 (P.R. 226), Commerce completely fails to understand the significance of these undisputed facts to its SRA analysis.  Rather, Commerce summarily dismisses Mr. Marco Tronchetti Provera's role by stating as follows:

> Pirelli's reliance on the 2017 Shareholder Agreement to show that Mr. Marco Tronchetti Provera has the exclusive authority to select Pirelli & C. S.p.A.'s management, thereby preventing board members from influencing the company's day-to-day operations, is misplaced.  Information on the record indicates that Pirelli & C.S.p.A. shall be managed by a Board of Directors composed of up to fifteen members.  The 2017 Shareholder Agreement also makes clear that Mr. Provera reports directly to Pirelli & C. S.p.A.'s board and that the board "delegated" authority to Mr. Provera in the management of Pirelli & C.S.p.A. In particular, the 2017 Shareholder Agreement shows that Mr. Provera is charged with implementing Pirelli & C.S.p.A.'s business plan and budget which are approved by Pirelli & C.S.p.A.'s board of directors.  As such, we are not convinced that Mr. Provera has exclusive authority to select Pirelli & C. S.p.A.'s management, thereby preventing board members from influencing the company's day-to-day operations.

*See* Final IDM at 17 (P.R. 226).

Commerce's supposed logic makes no sense.  Quite literally, at the same time, Commerce both (a) admits that, according to the 2017 Shareholder Agreement, "Mr.

**NONCONFIDENTIAL**

Marco Tronchetti Provera has the exclusive authority to select Pirelli & C. S.p.A.'s

management" but (b) also concludes that "we are not convinced that Mr. Tronchetti

Provera has exclusive authority to select Pirelli & C. S.p.A.'s management."  Given

Commerce's admission of (a), the conclusion of (b) is nonsensical.   From the evidentiary

record, it is an undisputed fact that Mr. Marco Tronchetti Provera had the exclusive

authority to select Pirelli Italy's management.  The fact that the power is "delegated" does

not rob it of any force any more than the fact that Commerce is implementing delegated

authority from the United States Congress over international trade diminishes its power in

implementing the antidumping laws.

[



]  We set forth these critical provisions below; all

of which Commerce largely ignored.

[




]

*See* Pirelli's SRA at Ex. 8, 2015 Sales Purchase Agreement (Tab A) (C.R.44).

**NONCONFIDENTIAL**

[



                                                                                    ]

*Id.*

[



                    ]

*Id.*  [



                                  ]  *See* Pirelli's SRA at Ex. 10 (Sections 4.1, Section

4.4., and Section 4.7 of [                                        ]) (P.R. 93).  Section 4.4. is

particularly relevant as it states [



                                  ]  Pirelli's SRA at Ex. 10 (P.R. 53) (emphasis supplied)

        As demonstrated above, the key governing documents authorized Mr. Marco

Tronchetti Provera to exclusively select the company management, preventing the

Chinese state-owned shareholders from influencing the company's day-to-day operations.

And, in fact, during  POR3, Pirelli Italy's management consisted of eight members.  *See*

Pirelli's SRA at Ex. 16D (C.R. 57).

**NONCONFIDENTIAL**

These senior managers were all Italian nationals who were selected by Mr. Marco Tronchetti Provera to carry out Pirelli Italy's day-to-day operations.  Mr. Marco Tronchetti Provera has also the power to decide over "significant matters" of Pirelli Italy, including approval of annual budget, business plan and any resolution concerning industrial partnerships or strategic joint ventures of Pirelli Italy.  Commerce should have taken into account that by granting Mr. Marco Tronchetti Provera—the independent CEO of Pirelli—the power over the approval and implementation of the budget, and by providing the Board of Directors—with a majority of independent members—authority to modify the budget and business plan, Pirelli Italy made sure there was absolutely no possibility for CNRC to manage Pirelli Italy's business.  Pirelli's SRA at Ex. 10, section 4.4 (P.R. 93).

In short, the record unequivocally confirms Mr. Marco Tronchetti Provera's independent authority over management of the company.  [



].  Accordingly, Commerce's contrary conclusion is not supported by substantial evidence.

### 2. Upon the relisting of Pirelli Italy Chinese state-owned shareholders ceased to have management and coordination activity over Pirelli Italy

After mentioning that the relevant Italian law provisions were not included in the record, Commerce's final decision opts for ignoring the significant evidence that, in 2017, Pirelli Italy's Board of Directors decided that, following the re-listing of the

**NONCONFIDENTIAL**

company on the Milan Stock Exchange, the company would be legally free of any

"management or coordination" by its Chinese state-owned shareholders CNRC or Chem

China.  Final IDM at 15 (P.R. 226). [

            ] *See* Pirelli's SRA at Ex. 10, Tab A

(Section 3.2.5) (P.R. 93).  Pirelli Italy's 2017 Annual Report makes very clear that:

> {T}he Board of Directors of Pirelli has determined that, from the First Trading Day {4 October 2017}, **Pirelli is no longer subject to any management and coordination** activities considered typical, neither by Marco Polo nor by other companies or entities (including CNRC and Chem China) and therefore, by way of example:
>
> 1.  Pirelli conducts relations with customers and suppliers in full autonomy without any external interference;
>
> 2.  Pirelli prepares the strategic, industrial, financial and/or budget plans of the Company or the Group independently;
>
> 3.  Pirelli is not subject to any group regulations;
>
> 4.  No organizational-functional links exist between Pirelli on the one hand and Marco Polo, CNRC and/or ChemChina on the other;
>
> 5.  Marco Polo, CNRC and/or ChemChina have not carried out any deeds, adopted any resolutions or made any communications that might cause reasonable belief that the decisions of Pirelli are in some way imposed or required by Marco Polo, CNRC and/or ChemChina;
>
> 6.  Marco Polo, CNRC and/or ChemChina do not centralise treasury management activities or other financial support or coordination functions;
>
> 7.  Marco Polo, CNRC and/or ChemChina do not issue directives or instructions – and in any case would not coordinate initiatives – concerning the financial and borrowing decisions of Pirelli;
>
> 8.  Marco Polo, CNRC and/or ChemChina do not issue directives regarding any special transactions carried out by Pirelli including, for example, the listing of financial instruments, acquisitions, disposals, concentrations, contributions, mergers, spin-offs etc.;

9.   Marco Polo, CNRC and/or ChemChina do not make any crucial decisions regarding the operating strategies of Pirelli.

Pirelli's SRA at Ex. 9 (2017 Annual Report at p. 205), Ex. 11 (August 2017 Press Release noting lack of influence of shareholders over business operations) (P.R. 91); s*ee also* Pirelli's SRA at Ex. 19 (excerpt from the Board of Directors' Meeting Minutes for Pirelli Italy of July 2017) (C.R. 57).

According to Italian law, "management and coordination" is a concept that consists in giving a unitary operational direction to different companies, by applying a common financial policy and strategy and managing them as a unique enterprise, with a view to a better achievement of the goals pursued by the whole group.  *See* Article 2497-ter of the Italian Civil Code provided in Attachment I. *See also* Pirelli's Case Brief 44-45 (P.R. 210).  This happens when there exists a constant flow of instructions relating to the management, the collection of financial resources, the financial statements, policies, etc., from the company exercising management and coordination activities to the company submitted to these management and coordination activities, i.e., in many multinational companies.  From a practical perspective, these instructions should be reflected in all decisions of the company that receives them, including in both the board of directors and shareholders' meeting resolutions, which must be properly grounded and explain the reasons and interests that led to that decision.  *Id*.

When a company is no longer subject to "management and coordination" of another company (according to Italian law, where the entity is subject to consolidation of relevant accounts by another company—See Article 2497-sexies of Italian Civil Code),

as it was in the case of Pirelli-Italy starting from October 4, 2017, such company and its subsidiaries are totally independent and autonomous from its shareholders and not subject to any instructions or guidelines or policies deriving thereby.

In its Final Determination, Commerce refused to consider this substantial evidence.

### 3. As a publicly listed company, Pirelli-Italy was legally required under Italian law to maintain relative independence from its largest shareholders in order to protect the interest of minority shareholders

During the underlying AD review, Pirelli explained in detail to Commerce that, as a listed company, Pirelli Italy had to be compliant with all related applicable Italian laws and regulations. Pirelli's SRA at 20 (P.R. 89); Pirelli's Case Brief at 44-45 (P.R. 210). And of particular importance was the fact that, <u>from its relisting in 2017</u>, Pirelli-Italy (once again) became subject to several Italian law constraints aimed to protect the interests of the minority shareholders and to the market. *See* Article 92 TUF, provided in Attachment I. *See also* Pirelli's Case Brief at 45 (P.R. 210).

Specifically, Pirelli Tyre explained to Commerce that the TUF, and more specifically Article 113-ter TUF provides for specific obligations on the part of listed issuers to make disclosures to the public and grants to CONSOB broad powers of control over such entities, including the power to request information, to verify the transparency of data meant for disclosure to the market, to conduct inspections and to impose sanctions in the event of failure to honor the obligations imposed. Pirelli's Case Brief at 21 (P.R. 210). This legal framework also governs related party transactions to ensure

transparency and substantive and procedural properness of transactions with related

parties conducted directly by the listed company or through its subsidiaries.  *See* Pirelli's

Case Brief at 46 (P.R. 210).  The related parties' regulation under Italian law provides

that the approval of related party transactions must be granted in advance in accordance

with procedures adopted by the board of directors. Article 4 of CONSOB Regulation no.

17221/2010 provided in Attachment I. In this regard, a key role is assigned to the

independent directors to ensure that the transactions are concluded in the company's

interest.  *See* Article 7, par. 1 and Article 8, par. 1 of CONSOB Regulation no.

17221/2010.

In its Final Determination, Commerce declined to even consider these important

Italian law provisions that actually limited the ability of Pirelli Italy's shareholders,

SASAC-supervised or otherwise, to undertake the very control that Commerce found.  As

we detail further below, such refusal to consider these Italian law provisions was

unlawful.

> **4.    The above undisputed facts demonstrate that Commerce failed to demonstrate the required link between a Chinese state-owned company and an individual in a position to hire and fire the management of Pirelli Tyre, the applicant.**

As noted above, Commerce's ultimate conclusion of Chinese government control

relies heavily on the fact that "Mr. Ren Jianxin was the Chairman and President of

SASAC-owned China Chem and the Chairman of the Board of Pirelli & C. S.p.A"  Final

IDM at 15 (P.R. 226).  By relying on this fact, it appears that Commerce's conclusion

relies on the "beholden theory" described by Judge Kelly in the *An Giang* case.

However, the *An Giang* opinion makes clear that, if Commerce wants to rely on the "beholden theory," it must demonstrate, with substantial evidence, a direct link between an individual employed by the government, or ostensibly controlled by the government, and the ability to hire and fire the management of the applicant. *An Giang Fisheries*, 284 F. Supp. 3d at 1364. Commerce has not done so in this case. Indeed, the fact pattern here presents a far more attenuated path from the state-controlled entity to the ultimate applicant than the situation Judge Kelly considered in the *An Giang* case.

In *An Giang*, the court upheld Commerce's redetermination on this point on the basis that the individual who was controlled by the Government, Mr. X (ostensibly a pseudonym), was the Director of the Board and General Manager of the actual applicant. *Id.* at 1362. There were no intervening shareholders and the government-controlled person had actual control over the compensation, hiring and firing of the individual employees engaged in the day-to-day management of the applicant. In focusing on these specific facts, Judge Kelly observed that "because of this prior practice {referring to certain administrative decisions} of requiring more *indicia* of control in minority situations, Commerce cannot focus solely on potentiality here. Without more, 'potential control' suggests the potential to influence management rather than the potential to actually control management." *Id.* (emphasis supplied). This records does not contain the direct link between a government-controlled individual and the ability to hire and fire the management of Pirelli China. There is simply no link that would rise to the level of direct ability to intercede that Judge Kelly found was necessary to support a denial of a separate rate based on a beholden theory.

NONCONFIDENTIAL

The facts presented to Commerce in this proceeding are fundamentally different from those in the *An Giang* case.  Mr. Ren Jianxin, through whom Commerce is finding the exercise of government control, is the Chairman of the Board of a company that is three steps removed from the actual applicant.  Pirelli's SRA at Ex. 5 (C.R. 43), 16D (P.R.93).  Additionally, the record shows that Mr. Ren Jianxin is not involved in any way in the day-today management of Pirelli China.  In fact, the general manager of Pirelli Tyre during POR3 was [

].  Pirelli SRA at Ex. 16B (C.R. 56).  There is no evidence in the record that could lead Commerce to conclude that this individual was controlled by the Government of China.

As a result, Commerce has misapplied the "beholden theory" in this case and inferred an actual ability to control the management of Pirelli China without a basis in the evidentiary record.  The same is true for Commerce's reliance on the appointment of certain other members of the board of Pirelli Italy.  There is no link, other than a theoretical one, to the management of Pirelli China.  As Judge Kelly found, a theoretical link alone is insufficient for a finding of actual ability to control under factor three of the separate rate test.  *An Giang*, 284 F. Supp. 3d at 1362 ("Commerce cannot focus solely on potentiality here, without more.").  Notably, in *Jiangsu Jiasheng Photovoltaic Tech. Co.*, the court affirmed Commerce's decision to grant the applicant a separate rate based on the fact that "management personnel selections — and in particular the selection of personnel with primary control over {the applicant's} production and business operations — were not in any way influenced by the government." *Jiangsu Jiasheng Photovoltaic*

*Tech. Co. v. United States*, 121 F. Supp. 3d 1263, 1271 (Ct. Int'l Trade 2015).  In short,

Commerce's primary premise for its conclusion regarding control of Pirelli China are not

supported substantial evidence and are contrary to court precedent.

### C.   Commerce's Dismissal Of The Relevance of Italian Corporate Law Provisions Was Both Unlawful and Not Supported By Substantial Evidence

In the underlying AD review, Pirelli Tyre provided detailed explanations to

Commerce on how the operation of Italian corporate law, with which Pirelli Italy (as an

Italian corporation) had to comply, was further evidence of the inability of Chinese state-

owned shareholders to control the management of Pirelli Italy.  Pirelli's SRA at 17 (P.R.

89); Pirelli's Case Brief at 38 (P.R. 210).  In particular, Pirelli Tyre highlighted the

appointment of a majority of independent directors conforming- and going further- the

requirements under Italian law.  *Id*.; *see also* Article 148, par. 3 TUF, provided in

Attachment I.

In its Final Determination, Commerce discarded Pirelli's arguments that the

independent directors were in fact independent under Italian law by stating that "{t}he

TUF is not on the record of this review. As such, we are not convinced that the majority

of Pirelli & C. S.p.A.'s board are 'independent directors' who are part of the legal

structure aimed to protect the interests of the minority shareholders Pirelli & C. S.p.A."

Final IDM at 15 (P.R. 226).  In the very next paragraph, however, Commerce makes a

determination regarding the force and effect of the very law it previously declined to

interpret.  Final IDM at 16 ("we are not convinced that Pirelli & C.S.p.A. must report that

it is controlled by Chem China mainly for accounting purposes pursuant to the Italian

Finance Code (Art. 93 TUF) or the dictates of Italian Finance Code (TUF D. Lgs. 58/1998)" (P.R. 226). We respectfully submit it is neither appropriate nor lawful for Commerce to recognize Italian corporate law for one conclusion and then refuse to recognize the same law for another conclusion.

Pirelli Tyre also notes that all of its representations regarding the content and import of the relevant Italian legal controls were submitted in a certified submission to Commerce and are therefore evidence of the content and import of those laws. There is nothing in the record—and indeed there is not even an allegation—that suggests that Pirelli Tyre mischaracterized those provisions.

Moreover, and importantly, the Italian Legal Code is also accessible in the same manner as the United States Code which is citable in antidumping proceedings without also being included in the administrative record as a separate document. Indeed, Rule 44.1 makes very clear that this Court can consider "all relevant material" concerning a foreign country's law "whether or not submitted by a party." USCIT Rule 44.1. The court has previously denied Commerce's efforts to strike interpretations of Italian law from the record of AD proceedings under USCIT Rule 44.1. *Nuove Industrie Elettriche Di Legnano S.p.A. v. United States*, 739 F. Supp. 1567 (Ct. Int'l Trade 1990).

Finally, to the extent Commerce found information about Italian corporate law submitted by Pirelli Tyre to be deficient in some way, Commerce had a statutory obligation to inform Pirelli of the supposed deficiency. *See* 19 U.S.C. §1677m. Because Commerce did not do so, it is not lawful for Commerce to rely on the alleged absence of the information for rendering its conclusion.

We respectfully submit that Commerce's great efforts to ignore Italian corporate law demonstrate the very importance of Italian law to the overall analysis of the presumption of *de facto* government control was rebutted.  In going out of its way to reject the clear import of Italian law, Commerce is implicitly acknowledging that the strictures of Italian law would limit or extinguish the potential for control over Pirelli Tyre's export operations.  As a result, Italian law inherently establishes the "minimum quantum" required under the jurisprudence of this circuit to rebut the presumption of government control.

### D. Commerce's Conclusion That The Minority Chinese State-Owned Shareholder Could Influence Pirelli's *Export Activities* Is Completely Unsupported by Substantial Evidence

In this section we demonstrate that, contrary to Commerce's insinuation in its final determination, there is no evidence whatsoever that the Chinese Government exercised de facto control over Pirelli Tyre's <u>export activities</u>. In fact, all the record evidence demonstrates the contrary.

As detailed above, the analysis that the Department employs for determining separate rate eligibility is set forth in its Policy Bulletin 05.1.  Policy Bulletin 05.1 makes it clear that the key question to resolve is whether a company "is subject to *de facto* government control of its <u>export activities</u>."  Policy Bulletin 05.1 (emphasis added). As Commerce itself has stated, "we are generally concerned with central government control and only grant separate rates where an exporter's <u>export activities</u> are shown to be independent of such government control."  *Hontex Enters. Inc. v. United States*, 248 F. Supp. 2d 1323, 1337 (Ct. Int'l Trade 2003) (emphasis added); *see also Guizhou Tyre*, 557

F. Supp. 3d at 1318 (remanding Commerce's determination for *inter alia* "being vague and ambiguous as to whether its inquiry is focused on government control of export activities"); *Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 519 F. Supp. 3d 1224, 1234 (Ct. Int'l Trade 2021) (remanding Commerce's determination to "explain its use of the phrase, and state whether 'export functions' are synonymous with 'export activities' or 'company's operations.'").

In detailing the four factor test to be used for analysis of the absence of *de facto* control, Policy Bulletin 05.1 explicitly notes that "Commerce's separate rates test is not concerned, in general, with macroeconomic border-type controls (e.g., export licenses, quotas, and minimum export prices). Rather, the test focuses on controls over the decision-making process on export-related investment, pricing, and output decisions at the individual firm level." Policy Bulletin 05.1 at 1 (emphasis supplied).  It is for this reason that Commerce has traditionally focused in applying its *de facto* control test on whether the respondent is able to negotiate selling prices with U.S. customers free of Chinese Government influence and spends a significant amount of its separate rate questionnaire probing this question.  Pirelli's SRA at 2-8 (detailing and documenting Pirelli Tyre's sales process), 25-26 (detailing and documenting Pirelli Tyre's price negotiation practices) (P.R. 89).

In the instant case, the final decision memorandum does not even discuss a link to Pirelli Tyre's export activities in its consideration of the Pirelli's eligibility for a separate rate.  *See* Final IDM at 13-18 (P.R. 226).  Indeed, Commerce's confidential Separate Rate Memorandum does not even contain the phrase "export activities" at all.  *See generally*

Separate Rate Memorandum (P.R. 228).  This is a crucial omission because Commerce's stated test  requires such a link. Specifically, Policy Bulletin 05.1 states that the entire reason for the four-part test at issue here is to gauge "whether each respondent is subject to *de facto* governmental control of its <u>export functions</u>." Policy Bulletin 05.1 at 2 (emphasis supplied).

Relevant for this Court is the fact that Senior Judge Stanceu has recently remanded a Commerce separate rate determination for further proceedings largely on the basis of a similar failure.  *Guizhou Tyre*, 557 F. Supp. 3d at 1319.  In that case the court found that Commerce's "analysis fails to clarify or explain whether its finding of government control extended, specifically, to {the applicant's} export activities during the period of investigation.  *Id*.

The facts under consideration in that case are highly analogous to the instant case. In the underlying AD review determination in *Guizhou Tyre*, Commerce's control finding was premised on a minority government-controlled share through which the government was supposedly exercising the potential for actual control.  *Id.* at 1317.  In rejecting Commerce's reasoning, the court ruled that held as follows:

> {T}he analysis as to {the applicant} in {the decision memorandum} does not focus specifically on export activities or functions in addressing government control. As a result, the separate rate analysis Commerce applied to {the applicant} failed to show a factual relationship between the findings it made as to selection of board members and distribution of profits and the purpose it identified for applying its de facto separate rate criteria in the preliminary phase, which was to determine whether the government of the PRC exercised control of {the applicant's} 'export activities' or 'export functions.'

*Id.* at 1319.  Commerce has, similarly, failed to make that necessary connection in this case.  And the reason for this Commerce failure is that there absolutely no evidence in the record indicating that the minority Chinese state-owned shareholders exercised control of Pirelli Tyre's export activities.

To the contrary, the evidentiary record makes crystal clear that Pirelli USA is the one primarily involved in price setting and engaging in negotiation with U.S. customers regarding price, not Pirelli Tyre.  *See* Pirelli's SRA at Ex. 15 (detailing price negotiations for a representative sale) (C.R. 56).   There is simply no evidence that Chem China, the Silk Road Fund, or any arm of the government of China can somehow control the price negotiations performed by a U.S. company, Pirelli USA.  As such, Commerce's final determination is unsupported by substantial evidence on the record.

**CONCLUSION**

Plaintiffs, the Pirelli Companies, respectfully request that this Court hold null and void the final AD determination that Commerce rendered in the underlying administrative review and therefore remand for Commerce to reissue its AD determination consistent with the following instructions: to assign Pirelli Tyre the AD rate applicable to separate rate respondents.

Respectfully submitted,

/s/ Daniel L. Porter

Daniel L. Porter
James P. Durling
James C. Beaty
Ana M. Amador Gil

*Counsel for Pirelli Tyre Co., Ltd., Pirelli Tyre S.p.A., and Pirelli Tire LLC*

## Word Count Certificate of Compliance

This brief has been prepared utilizing Microsoft Word 2010 using a proportionally spaced typeface 13 point Times New Roman font.

In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth in the Chambers Procedures. Specifically, excluding those exempted portions of the brief as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains 12,548 words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Daniel L. Porter

Daniel L. Porter

Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 452-7373

*Counsel for Pirelli Tyre Co., Ltd., Pirelli Tyre S.p.A., and Pirelli Tire LLC*