Slip Op. 23-38

# UNITED STATES COURT OF INTERNATIONAL TRADE

PIRELLI TYRE CO., LTD.,
PIRELLI TYRE S.P.A., and
PIRELLI TIRE LLC,

      Plaintiffs,

and

SHANDONG NEW CONTINENT
TIRE CO., LTD.,

      Plaintiff-Intervenor,

v.

UNITED STATES,

      Defendant,

and

THE UNITED STEEL, PAPER
AND FORESTRY, RUBBER,
MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND
SERVICE WORKERS
INTERNATIONAL UNION, AFL-
CIO, CLC,

      Defendant-Intervenor.

Before: Jennifer Choe-Groves, Judge

Court No. 20-00115

## OPINION AND ORDER

[Sustaining the U.S. Department of Commerce's remand results and final results in the antidumping duty administrative review of certain passenger vehicle and light truck tires from the People's Republic of China.]

Dated: March 20, 2023

Daniel L. Porter, James P. Durling, James C. Beaty, and Ana M. Amador Gil, Curtis, Mallet-Prevost, Colt & Mosle, LLP, of Washington, D.C., for Plaintiffs Pirelli Tyre Co., Ltd., Pirelli Tyre S.p.A., and Pirelli Tire LLC.

Ned H. Marshak, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, N.Y., and Andrew T. Schutz, Brandon M. Petelin, and Jordan C. Kahn, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, D.C., for Plaintiff-Intervenor Shandong New Continent Tire Co., Ltd.

Sosun Bae, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States. With her on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, and Patricia M. McCarthy, Director.  Of Counsel on the brief was Ayat Mujais, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

Nicholas J. Birch and Roger B. Schagrin, Schragrin Associates, of Washington, D.C., for Defendant-Intervenors United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC.

Choe-Groves, Judge:  This action arises from the results of the U.S.

Department of Commerce ("Commerce") in the antidumping administrative review

of certain passenger vehicle and light truck tires from the People's Republic of

China ("China") for the period of August 1, 2017 through July 31, 2018 ("Period

of Review 3").  Compl. at 1, ECF No. 6.  Plaintiffs Pirelli Tyre Co., Ltd. ("Pirelli

China"), Pirelli Tyre S.p.A., and Pirelli Tire LLC ("Pirelli USA") (collectively,

"Plaintiffs" or "Pirelli") filed this action pursuant to 28 U.S.C. § 1581(c) contesting

Commerce's final results in <u>Certain Passenger Vehicle and Light Truck Tires from

the People's Republic of China</u> ("<u>Final Results</u>"), 85 Fed. Reg. 22,396 (Dep't of

Commerce Apr. 22, 2020) (final results of antidumping duty admin. review; 2017–

2018). <u>See id.</u> Plaintiffs bring this suit to challenge: (1) whether Commerce had

statutory authority to issue a China-wide entity rate; (2) whether Commerce

properly applied the applicable legal criteria for analyzing Plaintiffs' separate rate

eligibility; and (3) Commerce's determination that Plaintiffs were controlled by the

Chinese government through the ownership of China National Chemical

Corporation ("Chem China"). <u>See id.</u> at 5–7.

   Before the Court is Plaintiffs' Rule 56.2 Motion for Judgment on the Agency

Record. Pls.' R. 56 Mot. J. Agency R. ("Plaintiffs' Motion" or "Pls.' Mot."), ECF

Nos. 65, 66. Defendant United States ("Defendant") and Defendant-Intervenor the

United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial

and Service Workers International Union, AFL-CIO, CLC ("Defendant-

Intervenor" or "Def.-Interv.") filed Defendant's Response to Plaintiffs' Rule 56.2

Motion for Judgment on the Agency Record and the Response Brief of Defendant-

Intervenor. Def.-Interv.'s Resp. Br. ("Def.-Interv.'s Resp."), ECF Nos. 71, 72;

Def.'s Resp. Pls.' R. 56.2 Mot. J. Agency R. ("Def.'s Resp."), ECF Nos. 74, 75.

Plaintiffs filed Plaintiffs' Reply Brief in Support of Motion for Judgment on the

Agency Record.  Pls.' Reply Br. Supp. Mot. J. Agency R. ("Pls.' Reply"), ECF

Nos. 79, 80.

   Also before the Court are Defendant-Intervenor's Comments in Opposition

to Remand Results.  Def.-Interv.'s Cmts. Opp'n Remand Results ("Defendant-

Intervenor's Comments" or "Def.-Interv.'s Cmts."), ECF Nos. 62, 63.  Defendant-

Intervenor opposes Commerce's redetermination on remand in the <u>Final Results of

Redetermination Pursuant to Court Remand</u> ("<u>Remand Results</u>"), ECF Nos. 55-1,

56-1, determining that the sole mandatory respondent in Commerce's review,

Shandong New Continent Tire Co., Ltd. ("New Continent"), reported sales

information accurately and was not involved in fraud.  <u>Id.</u> at 18–26.  Defendant and

Plaintiff-Intervenor New Continent filed Defendant's Response to Comments on

Remand Redetermination and Plaintiff-Intervenor's Comments in Support of

Remand Redetermination supporting the <u>Remand Results</u>.  Def.'s Resp. Cmts.

Remand Redetermination ("Defendant's Comments" or "Def.'s Cmts."), ECF Nos.

69, 70; Pl.-Interv.'s Cmts. Remand Results ("Plaintiff-Intervenor's Comments" or

"Pl.-Interv.'s Cmts."), ECF Nos. 73, 76.

   For the following reasons, the Court sustains Commerce's <u>Final Results</u> and

<u>Remand Results</u>.

## ISSUES PRESENTED

The Court reviews the following issues:

1. Whether Commerce's determination that New Continent provided accurate information during the administrative review was supported by substantial evidence;

2. Whether Plaintiffs have waived their challenge to Commerce's authority to impose a China-wide entity antidumping duty rate by not raising the issue in Plaintiffs' Motion; and

3. Whether Commerce's determination that Pirelli failed to rebut the presumption of *de facto* government control was in accordance with the law and supported by substantial evidence.

## BACKGROUND

In June 2015, Commerce issued an antidumping duty order covering certain passenger vehicle and light truck tires from China.  See Antidumping Duty Investigation of Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China, 80 Fed. Reg. 34,893 (Dep't of Commerce Jun. 18, 2015) (final determination of sales at less than fair value and final affirmative determination of critical circumstances, in part).  Commerce initiated an administrative review on October 4, 2018 of multiple companies, including Pirelli

China.  See Initiation of Antidumping and Countervailing Duty Administrative

Reviews, 83 Fed. Reg. 50,077, 50,081 (Dep't of Commerce Oct. 4, 2018).

     Pirelli China and Pirelli USA filed a separate rate application with

Commerce.  Pls.' Separate Rate App., PJA 3, CJA 1.[1]  In its Preliminary Results,

Commerce determined that Pirelli China had not demonstrated an absence of *de*

*jure* and *de facto* government control and denied Pirelli's Separate Rate

Application.  See Certain Passenger Vehicle and Light Truck Tires from the

People's Republic of China ("Prelim. Results"), 84 Fed. Reg. 55,909, 55,912

(Dep't of Commerce Oct. 18, 2019) (preliminary results of antidumping duty

admin. review and rescission, in part; 2017–2018), and accompanying Issues and

Decisions Memorandum ("Preliminary IDM" or "Prelim. IDM") at 13, 15, PJA 13.

Pirelli China was assigned the China-wide antidumping margin of 87.99 percent.

Prelim. IDM at 13.  Pirelli China and Pirelli USA filed an administrative case brief

("Pirelli's Administrative Case Brief") with Commerce requesting that Commerce

reverse the Preliminary Results and grant Pirelli China separate rate status.  Pls.'

Admin. Case Br., PJA 15, CJA 10.

---

[1]  Citations to the administrative record reflect the public joint appendix ("PJA")
and confidential joint appendix ("CJA") tab numbers filed in this case, ECF Nos.
81, 82.

Commerce published on April 15, 2020 the <u>Final Results</u> and accompanying Issues and Decision Memorandum ("Final IDM"), PJA 17.  In the <u>Final Results</u>, Commerce assigned mandatory respondent New Continent a zero percent weighted-average dumping margin, which was used as the basis for assigning dumping margins to non-individually examined respondents that qualified for separate rate status.  <u>Final Results</u>, 85 Fed. Reg. at 22,397.  Commerce also continued to determine that Pirelli China had not rebutted the presumption of *de facto* government control and was not entitled to a separate rate.  <u>Id.</u> at 22,399; Final IDM at 13.  Commerce determined that Pirelli China did not establish its "autonomy from the [Chinese] government in making decisions regarding the selection of management."  Final IDM at 14–18.

Pirelli commenced this action on May 21, 2020.  Summons, ECF No. 1; Compl.  After initiating this case, Plaintiffs filed Plaintiffs' Unopposed Motion to Stay the Proceedings pending the final determination by the United States Court of Appeals for the Federal Circuit ("CAFC") in <u>China Manufacturers Alliance, LLC v. United States</u>, 1 F.4th 1028 (Fed. Cir. 2021).  Pls.' Unopposed Mot. Stay Proceedings, ECF No. 23.  The Court granted the motion and stayed the case.  Order (Aug. 6, 2020), ECF No. 25.

On May 20, 2021, prior to the CAFC's decision in <u>China Manufacturers Alliance</u>, U.S. Customs and Border Protection ("Customs") notified Commerce

that it had observed inconsistencies between the Section A Questionnaire

Responses submitted by New Continent to Commerce and the corresponding

prices reported to Customs at the time of entry that resulted in an undervaluation of

approximately $2.6 million.  Def.'s Mot. Lift Stay Voluntary Remand

("Defendant's Remand Motion" or "Def.'s Remand Mot.") at Att. 1 ("Customs'

Referral Letter"), ECF No. 29.  Defendant requested that the Court remand the

administrative review results to Commerce for further examination.  Id. at 3–4.

The Court remanded the case on September 20, 2021 to Commerce.  Pirelli Tyre

Co. v. United States, 45 CIT __, 539 F. Supp. 3d 1257 (2021).

Commerce published on October 27, 2021 a notice of remand proceedings

and reopened the administrative record of the 2017–2018 antidumping

administrative review.  Remand Results at 3; Certain Passenger Vehicle and Light

Truck Tires From the People's Republic of China ("Notice of Remand"), 86 Fed.

Reg. 59,367 (Dep't of Commerce Oct. 27, 2021) (notice of remand proceeding and

reopening of 2017–2018 antidumping duty admin. review record).  Commerce

placed Customs' Referral Letter on the record and provided interested parties with

an opportunity to submit factual information and comments.  Remand Results at 3;

Notice of Remand, 86 Fed. Reg. at 59,368.  Commerce received comments from

interested parties and solicited supplemental questionnaire responses from New

Continent and NBR Wheels and Tires LLC.  Remand Results at 3–4.

Commerce issued its Remand Results on April 28, 2022, in which

Commerce determined that export price and constructed export price information

reported by New Continent in the administrative review was accurate.  Id. at

11–22.  Commerce also determined that the record did not support that New

Continent was affiliated with two other companies considered in the review.  Id. at

22–23.  Commerce did not adjust New Continent's antidumping margin, the rate

for individually examined respondents, or Pirelli's separate rate status.  See id. at

24.  Plaintiffs filed their Rule 56.2 Motion for Judgment on the Agency Record on

July 11, 2022.  See Pls.' Mot. J. Agency R.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff

Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i), and 28 U.S.C. § 1581(c).

The Court will hold unlawful any determination found to be unsupported by

substantial evidence on the record or otherwise not in accordance with the law.  19

U.S.C. § 1516a(b)(1)(B)(i).  The Court also reviews determinations made on

remand for compliance with the Court's remand order.  Ad Hoc Shrimp Trade

Action Comm. v. United States, 38 CIT 727, 730, 992 F. Supp. 2d 1285, 1290

(2014), aff'd, 802 F.3d 1339 (Fed. Cir. 2015).

## DISCUSSION

### I.    Remand Results

The Court remanded the <u>Final Results</u> to Commerce to address new information provided to Commerce by Customs regarding inaccuracies in the reported sales prices on imports of passenger vehicle tires from China during Period of Review 3.  <u>Pirelli Tire Co.</u>, 45 CIT at __, 539 F. Supp. 3d at 1261−62. Specifically, Customs compared the Section A Questionnaire Responses provided by New Continent to Commerce in the underlying investigation with Customs' import records and found a potential undervaluation of approximately $2.6 million. <u>See</u> <u>Notice of Remand</u>, 86 Fed. Reg. at 59,368.  This information raised concerns regarding the accuracy of New Continent's reporting to Commerce.  <u>Id.</u>

On remand, Commerce issued supplemental questionnaires to New Continent and NBR Wheels and Tires LLC seeking clarification of information on the administrative record.  <u>See</u> <u>Remand Results</u> at 4; Commerce's Supp. Questionnaire New Continent, PJA 27, CJA 18; Commerce's Second Supp. Questionnaire New Continent, PJA 30, CJA 21.  In response, New Continent provided more than 20,000 pages of information.  <u>Remand Results</u> at 4−5; New Continent's Supp. Questionnaire Resp., PJA 28, CJA 19; New Continent's Second Supp. Questionnaire Resp., PJA 31, CJA 22.

In the <u>Remand Results</u>, Commerce focused its analysis on the invoices submitted to Commerce rather than the invoices submitted to Customs in weighing the accuracy of the U.S. sales information provided by New Continent during the administrative review. <u>Remand Results</u> at 5–7, 15. Commerce considered the invoices provided to Customs relevant only to the extent that they prompted the remand. <u>Id.</u> at 20. Commerce analyzed information on the record pertaining to almost all of the transactions identified by Customs and determined that payment amounts were tied to the U.S. sales values reported by New Continent in the administrative review. <u>Id.</u> at 7–8, 19–20. Commerce was also able to match price and quantity data between invoices under consideration and corresponding invoices in New Continent's Section C database. <u>Id.</u> at 8. Based on its review of record evidence, Commerce determined that New Continent accurately reported export price and constructed export price sales during the administrative review. <u>Id.</u> at 8, 23–24. Commerce also determined that New Continent was not affiliated with the entities responsible for providing the allegedly inaccurate information to Customs. <u>Id.</u> at 10–11, 23–24.

Defendant-Intervenor asserts that Commerce failed to consider contradictory record evidence that called into question the accuracy of New Continent's reporting and failed to address the relevance of the alleged fraud on Customs.

Def.-Interv.'s Cmts. at 18–23.  Defendant and Plaintiff-Intervenor support

Commerce's <u>Remand Results</u>.  <u>See</u> Def.'s Cmts.; Pl.-Interv.'s Cmts.

Commerce analyzed documents relating to nearly all of the transactions

identified by Customs and expressed that it was:

> able to tie the payment amounts to the U.S. sales value reported by New
> Continent in its U.S. sales database from the underlying review as well
> as New Continent's financial statements [for most of the sales].  More
> specifically, we compared the prices and quantities of the invoices
> under question to those same invoices in the section C database and
> were able to fully match the values.

<u>Remand Results</u> at 7–8.  In its Supplemental Questionnaire Response, New

Continent explained that for the majority of its submitted invoices, it was not

possible to a make a one-to-one link between the payment and the invoice because

New Continent's accounting was based on a running debt and credit balance that

was reconciled annually.  New Continent's Supp. Questionnaire Resp. at 21–22.

Defendant-Intervenor contends that Commerce must provide an explanation of its

methodology for assigning payments to sales information in its analysis.  Def.-

Interv.'s Cmts. at 18–20.

Commerce's analysis did not rely solely on New Continent's Supplemental

Questionnaire Response, and Commerce cited to record documents containing

payment information for invoices and accounting subledgers.  <u>Remand Results</u> at

19; <u>see also</u> New Continent's Sub. New Factual Info. at Exs. 18 (worksheet linking

Section C database invoice values with invoice values submitted by New

Continent), 19 (invoices contained in Section C database), PJA 23, CJA 15; New

Continent's Supp. Questionnaire Resp. at Ex. S-9 ("New Continent's Payment

Package"). Commerce also noted that its review during the remand covered

significantly more transactions than were considered during Commerce's standard

verification. Remand Results at 19–20. Commerce's remand analysis covered

most of the invoices identified by Customs, and Commerce explained that it

compared "prices and quantities of the invoices under question to those same

invoices in the section C database." Id. at 7–8.

Defendant-Intervenor asserts that Commerce disregarded the argument that

certain record information was inaccurate and contradicted by other record

documents. Def.-Interv.'s Cmts. at 20–21. Though Commerce did not directly

address inconsistencies between specific documents, the Remand Results make

clear that Commerce considered information covering most of the relevant

transactions. See Remand Results at 19; see also New Continent's Sub. New

Factual Info. at Exs. 18, 19; New Continent's Payment Package. Commerce

focused on the accuracy of the information submitted in the administrative review

in order to calculate the antidumping margin, not inconsistencies with information

submitted to Customs. Remand Results at 20–21. Based on record evidence,

Commerce determined that the U.S. price information reported to Commerce by New Continent was accurate.  Id. at 21.

    In its review, Commerce compared invoices submitted by New Continent during the administrative review and corresponding invoices submitted during the remand.  Id. at 15.  Commerce determined that relevant information, including sales price, quantity, and U.S. sales values, were consistent between the invoices. Id.  Defendant-Intervenor contends that the record does not support Commerce's determination regarding New Continent's reproduction of invoices and includes examples of inconsistent information.  Def.-Interv.'s Cmts. at 21–23.  In comparing invoices submitted in both the administrative review and remand, Commerce determined that the consistency of the relevant information:

> supports New Continent's claim that while electronic versions of its sales documents cannot be reproduced exactly, the differences between the reproduced documents for this remand and the documents submitted during the administrative review are superficial.  New Continent is an experienced exporter having participated in the underlying administrative review as a mandatory respondent.  We note that in an ongoing administrative review or investigation, we would expect an experienced exporter like New Continent to provide original sales documentation, as it did during the underlying administrative review.  However, New Continent was not aware of the [Customs] Referral until May 2021, nor involved in litigation for this administrative review until September 2021.  Thus, we are not persuaded by the petitioner's claim that New Continent would have known that "Commerce would call upon it in a review to produce information such as original copies of invoices," because it is unclear how New Continent could have anticipated that Commerce would

request for a remand to reexamine its U.S. sales information some
seventeen months after previously uncontested final results, or that the
Court would grant that request.   Therefore, we find there is no
evidentiary basis to conclude that the quantity and value
information . . . have been modified.

Remand Results at 18.

Defendant-Intervenor contends that Commerce did not address a specific

example raised during the remand in which multiple versions of an invoice were

included on the record reflecting different information.  Def.-Interv.'s Cmts. at 22.

The Remand Results do not directly address this example; however, in relation to

the number of transactions considered in Commerce's review, it is reasonable to

conclude that potentially inconsistent details in a single set of invoices does not

undermine the accuracy of the greater body of information reviewed by

Commerce.  It is clear from the Remand Results that Commerce considered a large

volume of record submissions, including over 20,000 pages of documents from

New Continent, and determined that any inconsistencies were minor and did not

significantly impact the calculation of the antidumping duty.  The Court agrees that

Commerce's review of a voluminous number of record documents was reasonable

and accounted for any potential inconsistencies in a few invoices.

Defendant-Intervenor argues that Commerce did not properly consider the

issue of potential fraud in its determination.  Def-Interv.'s Cmts. at 23–26.

Defendant-Intervenor contends that the record contained evidence that New

Continent was aware of the inaccurate information submitted to Customs because a certain nomenclature was used in both the challenged invoices and documents prepared by New Continent.  Id. at 23.  Commerce addressed this issue in the Remand Results by discussing New Continent's explanation that the numbers were inadvertently copied by a manager working with information provided by an affiliate in preparing the Section C database.  Remand Results at 17–18. Commerce determined this explanation to be consistent with the steps taken by New Continent to ensure that material information in finalized invoices was not changed after issuance, which included sales managers creating a commercial invoice using Excel with information downloaded from a sales system.  Id. Commerce also determined that New Continent's explanation was supported by Commerce's comparison of invoices between the administrative review and remand.  Id. at 18.

The issue before Commerce on remand was whether the information submitted by New Continent in the administrative review was accurate, while the issue of fraudulent representations to Customs was within Customs' statutory authority.  19 U.S.C. § 1592.  The Court concludes that Commerce was reasonable in limiting its determination to the accuracy of New Continent's information submitted during the administrative review.  See Remand Results at 11–22.

In the <u>Remand Results</u>, Commerce addressed whether New Continent was affiliated with the entities that made alleged misrepresentations to Customs. <u>Id.</u> at 22–23. Upon consideration of record documents, including declarations from a New Continent employee, Commerce determined that New Continent did not satisfy the requirements for affiliation under 19 U.S.C. § 1677(33) and 19 C.F.R. § 351.102(b)(3). <u>Id.</u> at 23. Commerce also determined that the record did not show that the considered entities had a relationship that might impact relevant decision making. <u>Id.</u> Commerce determined that New Continent was not affiliated with the considered entities. <u>Id.</u> at 23–24. No Party opposes this determination before the Court.

The arguments raised by Defendant-Intervenor are unavailing. Because Commerce conducted a review of the voluminous record evidence presented and verified the accuracy of the relevant information submitted by New Continent during the administrative review, the Court concludes that Commerce's determination that the information submitted by New Continent was accurate is supported by substantial record evidence.

## II.    Commerce's Authority to Issue a China-Wide Entity Rate

Defendant-Intervenor argues that Plaintiffs abandoned and waived Count I of their Complaint. Def.-Interv.'s Resp. at 7–8. In Count I of the Complaint, Pirelli argued that Commerce lacked the statutory authority to impose a China-

wide entity antidumping duty rate.  Compl. at 5.  Pirelli did not renew this

argument in its motion for judgment on the agency record and conceded that "the

Federal Circuit has recently ruled that Commerce does in fact have the authority to

apply a 'China-Wide Rate' under the statute."  Pls.' Mot. J. Agency R. at 13–14

(citing <u>China Mfrs. All.</u>, 1 F.4th at 1039).  Pirelli also does not address Defendant-

Intervenor's waiver assertion in its reply.  <u>See</u> Pls.' Reply.  Because Pirelli failed to

raise its argument regarding Commerce's authority to impose a China-wide entity

rate in its opening brief and did not meaningfully assert the argument in its reply,

the argument is waived.  <u>See</u> <u>SmithKline Beecham Corp. v. Apotex Corp.</u>, 439

F.3d 1312, 1319 (Fed. Cir. 2006) ("Our law is well established that arguments not

raised in the opening brief are waived.").

### III.   Pirelli's Separate Rate Status

The Court previously considered Pirelli's separate rate status in an earlier

administrative review that covered the period from January 27, 2015 to July 31,

2016 ("Period of Review 1").  <u>See</u> <u>Shandong Yongtai Grp. Co. v. United States</u>

("<u>Shandong Yongtai I</u>"), 43 CIT __, __, 415 F. Supp. 3d 1303, 1315–18 (2019);

<u>Shandong Yongtai Grp. Co. v. United States</u> ("<u>Shandong Yongtai II</u>"),44 CIT __,

__, 487 F. Supp. 3d 1335, 1344–46 (2020); <u>Qingdao Sentury Tire Co. v. United</u>

<u>States</u> ("<u>Qingdao Sentury I</u>"), 45 CIT __, __, 539 F. Supp. 3d 1278, 1282–85

(2021); <u>Qingdao Sentury Tire Co. v. United States</u> ("<u>Qingdao Sentury II</u>"), 46 CIT

__, __, 577 F. Supp. 3d 1343, 1347–49 (2022).  Pirelli China was established as a

Sino-foreign joint venture between the Dutch subsidiary of Pirelli & C. S.p.A.

("Pirelli Italy") and Hixih Group in 2005.  Shandong Yongtai I, 43 CIT at __, 415

F. Supp. 3d at 1315–16.  Chem China, a company owned by the Chinese

government, acquired Pirelli S.p.A. in October 2015.  Id. at __, 415 F. Supp. 3d at

1316.  Following the acquisition, Pirelli Italy was delisted from the Milan Stock

Exchange.  Id.

        Before this Court, Pirelli challenged Commerce's determination that Pirelli

was ineligible for separate rate status during Period of Review 1 for both the

periods before and after Pirelli S.p.A.'s acquisition by Chem China.  See Shandong

Yongtai II, 44 CIT at __, 487 F. Supp. 3d at 1344–46; Qingdao Sentury II, 46 CIT

at __, 577 F. Supp. 3d at 1347–49.  Commerce considered record documents,

including Pirelli's articles of association, purchase agreements, Board of Directors

meeting minutes, resolutions, and company financial statements, and concluded

that Chem China and the Silk Road Fund, both Chinese government-controlled

entities, owned a majority of Pirelli China and exercised control through Pirelli's

Board of Directors and ownership structure.  Shandong Yongtai II, 44 CIT at __,

487 F. Supp. 3d at 1346.  Commerce determined that for the period following

Pirelli S.p.A.'s acquisition by Chem China, Pirelli did not have autonomy from the

Chinese government in its decision making and was unable to demonstrate a lack

of *de facto* government control.  Id.  The Court sustained Commerce's

determination.  Id.

It is unclear from the record whether Pirelli applied for separate rate status

during Commerce's administrative review for the period of August 1, 2016

through July 31, 2017 ("Period of Review 2").  See Antidumping or

Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to

Request Administrative Review, 82 Fed. Reg. 35,754, 35,755 (Dep't of Commerce

Aug. 1, 2017).  Relevant to this case, Pirelli applied for separate rate status for

Period of Review 3, which covered August 1, 2017 through July 31, 2018.  See

Pls.' Separate Rate App.

Pirelli's Separate Rate Application reflected certain changes in Pirelli's

ownership and management structure between the end of Period of Review 1 and

the end of Period of Review 3.  For example, Pirelli Italy relisted on the Milan

Stock Exchange on October 4, 2017.  Id. at 18.  At the time of relisting, Chem

China and the Silk Road Fund had decreased their combined indirect majority

ownership in Pirelli Italy and Pirelli China to indirect minority ownership.  Id. at

13–14, 18–19.  Commensurate with the relisting on the Milan Stock Exchange,

Pirelli ceased public management and coordination activities with its holding

company, Marco Polo International Italy S.p.A. ("Marco Polo"), and all other

companies, including Chem China.  Id. at 19–20; Pls.' Separate Rate App. at Ex.

9.1 ("Pirelli Group's 2017 Annual Report") at 205, PJA 6, CJA 4; Pls.' Separate

Rate App. at Ex. 11 ("Pirelli Italy's August 2017 Press Release"), PJA 8, CJA 6.

Pirelli Italy also altered the composition of its Board of Directors to require a

majority of directors to be designated as "independent."  Pls.' Separate Rate App.

at Ex. 10 ("Pirelli's 2017 Shareholders Agreement") § 4.2.2, PJA 8, CJA 6.

Despite these changes to Pirelli's ownership and management structures,

Commerce determined that Pirelli did not demonstrate "autonomy from the

[Chinese] government in making decisions regarding the selection of management"

and did not rebut the presumption of *de facto* government control.  <u>Final Results</u>,

85 Fed. Reg. at 22,399; Final IDM at 13–18.  Commerce denied Pirelli's Separate

Rate Application.  <u>Final Results</u>, 85 Fed. Reg. at 22,399.

     Plaintiffs raise two primary arguments challenging Commerce's denial of

Pirelli's Separate Rate Application.  First, Plaintiffs contend that Commerce's

determination was unlawful because Commerce failed to apply the proper standard

of review for a company that is minority-owned by a government-controlled entity,

failed to connect suspected government control to Pirelli's export activities, and

did not apply relevant provisions of Italian law.  Pls.' Br. at 12–22.  Second,

Plaintiffs argue that Commerce's determination that Pirelli failed to rebut the

presumption of *de facto* government control was unsupported by record evidence

because Commerce failed to appreciate that changes to Pirelli's ownership and

management structure purportedly insulated Pirelli from external influences of

Chinese government control.  Id. at 23–49.

### A.    Legal Framework

Commerce has the authority to designate a country as a nonmarket economy

pursuant to 19 U.S.C. § 1677(18).  19 U.S.C. § 1677(18).  Commerce employs a

rebuttable presumption that all companies within a nonmarket economy country

are subject to government control and should be assigned a single, country-wide

rate by default, unless the exporter requests an individualized antidumping margin

and demonstrates affirmatively that the exporter maintains both *de facto* and *de*

*jure* independence from the government.  Sigma Corp. v. United States, 117 F.3d

1401, 1405 (Fed. Cir. 1997).  The burden of proving the absence of government

control rests with the exporter.  Id. at 1405–06.  Exporters that are unable to

demonstrate both *de facto* and *de jure* independence from government control do

not qualify for a separate rate.  China Mfrs. All., 1 F.4th at 1032; Transcom, Inc. v.

United States, 294 F.3d 1371, 1373 (Fed. Cir. 2002).

Commerce has identified three factors that it considers when determining

whether an exporter enjoys independence from *de jure* government control: (1) an

absence of restrictive stipulations associated with an individual exporter's business

and export licenses; (2) any legislative enactments decentralizing control of

companies; and (3) any other formal measures by the government decentralizing

control of companies.  See Ad Hoc Shrimp Trade Action Comm. v. United States,

37 CIT 1085, 1090 n.21, 925 F. Supp. 2d 1315, 1320 n.21 (2013) (citation

omitted).

Commerce considers four factors in determining whether an exporter is free

of *de facto* government control: (1) whether the export prices are set by or are

subject to the approval of a government authority; (2) whether the respondent has

authority to negotiate and sign contracts and other agreements; (3) whether the

respondent has autonomy from the government in making decisions regarding the

selection of management; and (4) whether the respondent retains the proceeds of

its export sales and makes independent decisions regarding disposition of profits or

financing of losses.  See id.; Separate-Rates Practice and Application of

Combination Rates in Antidumping Investigations Involving Non-Market

Economy Countries (Apr. 5, 2005) ("Policy Bulletin 05.1" or "Policy Bull. 05.1")

at 2.

The CAFC has sustained Commerce's application of the rebuttable

presumption of government control for nonmarket economies.  Diamond

Sawblades Mfrs. Coal. v. United States, 866 F.3d 1304, 1311 (Fed. Cir. 2017); see

also Changzhou Hawd Flooring Co. v. United States, 848 F.3d 1006, 1009 (Fed.

Cir. 2017).  All four factors of the *de facto* test must be satisfied to rebut the

presumption of government control.  See Yantai CMC Bearing Co. v. United

States, 41 CIT __, __, 203 F. Supp. 3d 1317, 1325–26 (2017).  The *de facto* test is

therefore conjunctive, and an exporter must satisfy all four factors to rebut the

presumption of government control.  See Zhejiang Quzhou Lianzhou Refrigerants

Co. v. United States, 42 CIT __, __, 350 F. Supp. 3d 1308, 1321 (2018).

Commerce determined in the Final Results that Pirelli failed to satisfy the third

criterion of the *de facto* test, whether the respondent has autonomy from the

government in making decisions regarding the selection of management.  Final

Results, 85 Fed. Reg. at 22,399; Final IDM at 13–18; see also Prelim. IDM at 13;

Commerce's Prelim. Separate Rate Mem. ("Preliminary Separate Rate Memo" or

"Prelim. Separate Rate Mem.") at 2–3, PJA 14, CJA 9.

### B.    Lawfulness of Commerce's Analysis

Plaintiffs contend that Commerce's analysis of Pirelli's separate rate

eligibility was unlawful because Commerce failed to apply a lesser burden of proof

for a minority foreign-owned company, failed to require actual, rather than

potential control, and failed to link its findings to Pirelli's export activities.  Pls.'

Br. at 12–22.  Specifically, Plaintiffs argue that Commerce's past practice and the

precedent of this Court reflect that a lower burden of proof should be required in

instances in which government-controlled entities hold only a minority interest in

the respondent exporter.  Id. at 14–15.  Plaintiffs contend that Commerce failed to

make this distinction in practice and held Pirelli to the higher standard applicable

to a majority government-owned company.  Id.  Defendant-Intervenor contends

that Plaintiffs are incorrect in their assertion that a lower burden of proof is

applicable to rebut the presumption of government control when the government is

a minority owner.  Def.-Interv.'s Resp. at 10–17.  Defendant-Intervenor also

asserts that Plaintiffs' argument has been waived because Pirelli did not raise it

before Commerce.  Id. at 10–11.  Defendant contends that the standard applied by

Commerce in this case was not higher than the standard normally applied in

instances of minority government ownership.  Def.'s Resp. at 10–17.

        Plaintiffs offer three cases in support of the position that Commerce may

impose a higher burden of proof on exporters seeking a separate rate when a

government-controlled entity has a direct or indirect majority interest in the

exporter: Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States, 42 CIT __,

350 F. Supp. 3d 1308 (2018), Shandong Rongxin Import & Export Co. v. United

States, 43 CIT __, 415 F. Supp. 3d 1319 (2019), and Yantai CMC Bearing Co. v.

United States, 41 CIT __, 203 F. Supp. 3d 1317 (2017).  Pls.' Br. at 14–15.

Plaintiffs ask the Court to recognize as a corollary to this rule that "minority

ownership by a government-controlled entity, as is the case here, requires a lower

burden of proof and it should be more likely that Commerce will grant a separate

rate in those situations."  Id. at 15 (emphasis in original).

In Zhejiang Quzhou Lianzhou Refrigerants Company, the Court recognized that though evidence of legal separation between an exporter and its government-controlled parent may rebut the presumption of *de facto* government-control when the government holds a minority stake in the exporter, such separation would not rebut the presumption when the government holds a majority stake in the exporter "because of the ever-present potential for the government to exert *de facto* control over the exporter's operations and management selection, and the expectation that it would do so." Zhejiang Quzhou Lianzhou Refrigerants Co., 42 CIT at __, 350 F. Supp. 3d at 1318. Similarly, in Shandong Rongxin Import & Export Company, the Court noted that "the presumption of *de facto* government control is quite strong for respondents with a government majority shareholder." Shandong Rongxin Imp. & Exp. Co., 43 CIT at __, 415 F. Supp. 3d at 1323–25. Finally, in Yantai CMC Bearing Company, the Court observed that particular facts, such as majority ownership, may be sufficient to support a determination of *de facto* government control, but the fact alone does not make the presumption of control irrebuttable. Yantai CMC Bearing Co., 41 CIT at __, 203 F. Supp. 3d at 1325–26.

The Court does not agree with Plaintiffs' assertion that there is a different standard of proof based on the degree of the government's ownership stake in a respondent exporter. Commerce employs a rebuttable presumption that all companies within a nonmarket economy country are subject to government control

and should be assigned a single, country-wide entity rate by default, unless the

exporter requests an individualized antidumping margin and demonstrates

affirmatively that the exporter maintains both *de facto* and *de jure* independence

from the government.  19 U.S.C. § 1677(18); Sigma Corp., 117 F.3d at 1405.  As

an exporter from China, Pirelli had the burden of rebutting the presumption of

Chinese government control.  Sigma Corp., 117 F.3d at 1405.  The cases cited by

Plaintiffs recognize that Commerce may consider evidence of majority government

ownership as strong support for the presumption, but the cases do not alter the

exporter's burden of proof.

In this case, Commerce acknowledged that Pirelli had a minority indirect

ownership by government-controlled entities and explained that Commerce would

consider additional facts relating to Pirelli's independence.  Final IDM at 15.

Commerce reviewed record evidence showing Pirelli's organization, ownership,

and Board of Directors.  Id. at 14–18.  Commerce also addressed arguments raised

by Pirelli based on Italian law, the degree of authority held by Pirelli's CEO, and

the transfer and disposal of proprietary know-how.  Id. at 15–17.

Because Plaintiffs had the burden of rebutting the presumption of

government-control through proffered evidence, and there is no indication that

Commerce imposed a higher burden upon Pirelli nor legal support for a lesser

burden to be imposed, the Court concludes that Commerce's application of the burden of proof was in accordance with the law.

Plaintiffs argue further that Commerce's determination was unlawful because it was based on the presumption of theoretical potential government control rather than evidence of actual government control, resulting in an unlawful irrebuttable presumption. Pls.' Br. at 16–19. Neither Defendant nor Defendant-Intervenor directly respond to the merits of Plaintiffs' argument regarding Commerce's theory of control. But see Def.'s Resp. at 15 n.6 (summarily arguing that if the argument is not deemed waived, it should be rejected). Defendant-Intervenor contends that Commerce properly considered the ability of government-controlled entities to influence Pirelli's management and operations in denying Pirelli's Separate Rate Application. Def.-Interv.'s Resp. at 12–17. Defendants argue that Plaintiffs are foreclosed from raising this issue before the Court because Pirelli failed to exhaust available administrative remedies by first raising the issue before Commerce. Def.'s Resp. at 13–15.

The Court first addresses Defendant's failure to exhaust argument. Congress has directed that this Court "shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). The statute "indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies."

Boomerang Tube LLC v. United States, 856 F.3d 908, 912 (Fed. Cir. 2017) (citing

Corus Staal BV v. United States, 502 F.3d 1370, 1379 (Fed. Cir. 2007)).

Commerce's regulations specifically require that a party raise all arguments in a

timely manner before the agency.  Corus Staal, 502 F.3d at 1379 (citing 19 C.F.R.

§ 351.309(c)(2)).  "[G]eneral policies underlying the exhaustion requirement—

protecting administrative agency authority and promoting judicial efficiency"—

would be vitiated if the court were to consider arguments raised for the first time in

judicial proceedings.  See id. (internal quotation and citation omitted); see also

Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States, 41 CIT __, __,

277 F. Supp. 3d 1346, 1353 (2017).  The exhaustion requirement is not absolute

and the Court has recognized limited exceptions to the doctrine: (1) futility in

raising the issue; (2) a subsequent court decision that may impact the agency's

decision; (3) a pure question of law; or (4) when plaintiff had no reason to believe

the agency would not follow established precedent.  See Luoyang Bearing Factory

v. United States, 26 CIT 1156, 1186 n.26, 240 F. Supp. 2d 1268, 1297 n.26 (2002)

(citing authorities).  Defendant asserts that Pirelli did not raise the issue of

potential and actual control before Commerce and cannot assert any of the

recognized exceptions to the exhaustion requirement.  Def.'s Resp. at 13–15.

Plaintiffs did not respond to Defendant's exhaustion argument.  See Pls.' Reply at

5.

When considering the exhaustion requirement, the determinative question

for the Court is whether Commerce was put on notice of the argument.  See Trust

Chem. Co. v. United States, 35 CIT 1012, 1023 n.27, 791 F. Supp. 2d 1257, 1268

n.27 (2011).  Commerce gave no indication prior to the Final Results that its

analysis would consider potential, rather than actual control.  Despite this, Pirelli

made numerous arguments in Pirelli's Administrative Case Brief addressing Pirelli

China's independence from the actual control of Pirelli Italy and the minority

owners.  See Pls.' Admin. Case Br. at 32–43.  Because Commerce should have

been aware that Pirelli was arguing that actual control was absent, Plaintiffs'

arguments are not now barred.

In antidumping proceedings involving a nonmarket economy, Commerce

presumes that all respondents are government-controlled and subject to a single

country-wide antidumping rate.  Diamond Sawblades Mfrs. Coal., 866 F.3d at

1311.  The percentage of government ownership of a responding company is

relevant to Commerce's analysis because majority ownership is viewed as actual

control, regardless of whether such control is actually exercised.  See Can Tho

Imp.-Exp. Joint Stock Co. v. United States, 44 CIT __, __, 435 F. Supp. 3d 1300,

1305–06 (2020); An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States,

42 CIT __, __, 284 F. Supp. 3d 1350, 1359 (2018).  When a respondent company

is minority government owned, potential control does not necessarily equate to

actual control.  See Zhejiang Quzhou Lianzhou Refrigerants Co., 42 CIT at __, 350

F. Supp. 3d at 1318; An Giang Fisheries Imp. & Exp. Joint Stock Co., 42 CIT at

__, 284 F. Supp. 3d at 1359.  In such situations, "Commerce has required

additional indicia of control prior to concluding that a respondent company could

not rebut the presumption of *de facto* government control where the government

owns, either directly or indirectly, only a minority of shares in the respondent

company."  An Giang Fisheries Imp. & Exp. Joint Stock Co., 42 CIT at __, 284 F.

Supp. 3d at 1359.

> In its determination, Commerce explained:

> When conducting a separate rate analysis for a company with less than
> a majority of [state owned enterprise] ownership, Commerce has
> considered whether the record contains additional indicia of control
> sufficient to demonstrate that the company lacks independence and
> therefore should receive the China-wide rate.  Commerce's practice is
> to examine whether the government might also be able to exercise, or
> have the potential to exercise, control of a company's general
> operations through minority government ownership under certain
> factual scenarios.

Final IDM at 15.  Though Commerce's use of the term "potential" in explaining its

practice might arguably create some ambiguity in what degree of government

control Commerce is considering, see An Giang Fisheries Imp. & Exp. Joint Stock

Co., 42 CIT at __, 284 F. Supp. 3d at 1359, Commerce recognized the need in a

case of minority government ownership, such as this, for additional indicia of

control.  Final IDM at 15.  This need is further supported by Commerce's

subsequent consideration and discussion of Pirelli's ownership, the composition

and independence of Pirelli's Board of Directors, common board members

between Pirelli entities and government-controlled entities, statements in Pirelli's

2017 Annual Report, the authority of Pirelli's CEO, Marco Tronchetti Provera, and

the transfer and/or disposal of proprietary know-how. Id. at 15–18. The Court

concludes that it was reasonable for Commerce to consider the potential for control

together with additional indicia, and its analysis was in accordance with the law.

  Plaintiffs argue that Commerce's determination was not in accordance with

the law because Commerce failed to link Pirelli's export activities or export

functions with the separate rate analysis. Pls.' Br. at 19–21. Defendant argues that

Commerce is not required to specifically discuss export activities or export

functions in the context of the third factor of the *de facto* control analysis, which

asks whether a respondent has autonomy in making decisions regarding the

selection of its management. Def.'s Resp. at 15–17. Defendant-Intervenor

similarly argues that the *de facto* control analysis does not require consideration of

export activities or export functions in addition to the factors enumerated in Policy

Bulletin 05.1. Def.-Interv.'s Resp. at 25–26.

  Policy Bulletin 05.1 states that the purpose of Commerce's control analysis

is "[t]o establish whether a firm is sufficiently independent from governmental

control in its export activities to be eligible for separate rate status." Policy

Bulletin 05.1 at 2.  Separate rate status is granted "only if an exporter can

demonstrate the absence of both *de jure* and *de facto* governmental control over its

*export activities*."  Id. (emphasis added).  Policy Bulletin 05.1 further provides

that:

> [Commerce] considers four factors in evaluating whether each
> respondent is subject to *de facto* governmental control *of its export
> functions*: 1) whether the export prices are set by, or subject to the
> approval of, a governmental authority; 2) whether the respondent has
> authority to negotiate and sign contracts and other agreements;
> 3) whether the respondent has autonomy from the central, provincial
> and local governments in making decisions regarding the selection of
> its management; and 4) whether the respondent retains the proceeds of
> its export sales and makes independent decisions regarding disposition
> of profits or financing of losses.

Id. at 2 (emphasis added).

Plaintiffs assert that "[t]he Court has consistently ruled that Commerce must

give meaning to the words 'export activities' in Commerce's discussion of its

separate rate test."  Pls.' Br. at 19.  The only case offered by Plaintiffs in support of

this contention, however, is Guizhou Tyre Co., Ltd. v. United States, 46 CIT __,

557 F. Supp. 3d 1302 (2022), an ongoing litigation.  Id. at 20.  Plaintiffs have not

cited any authority that would support a requirement in the third factor for

Commerce to connect an exporter's autonomy in selecting management with

specific export activities or export functions.

Separate rate status is granted if an exporter can demonstrate the absence of *de facto* governmental control according to the four-factor test.  The Court notes that the first factor examines whether "export prices" are set by or are subject to government approval, and the fourth factor examines whether the respondent retains the proceeds of its "export sales" and makes independent financial decisions.  Policy Bull. 05.1 at 2.  In contrast, the Court observes that neither the second nor third factors mention export activities or export functions.  Id. Specifically the third factor of the *de facto* control analysis relevant to this case— "3) whether the respondent has autonomy from the central, provincial and local governments in making decisions regarding the selection of its management"— does not mention export activities or export functions.  Id.  The Court declines to adopt the approach asserted by Plaintiffs and alter the third factor of the *de facto* control test to read an additional requirement for Commerce to assess whether respondent has autonomy from government control in respondent's export activities or export functions.

Plaintiffs argue also that Commerce's determination is unlawful because Commerce refused to consider provisions of Italian law on which Pirelli relied. Pls.' Br. at 44–46.  Commerce rejected Pirelli's argument that Italian law requires that certain directors be independent of shareholders, concluding that "[t]he [Italian Finance Code] is not on the record of this review.  As such, we are not convinced

that the majority of Pirelli [Italy's] board are 'independent directors' who are part

of the legal structure aimed to protect the interests of the minority shareholders [of]

Pirelli [Italy]."  Final IDM at 15.  Commerce used similar language in considering

Pirelli's argument that Italian law required Pirelli Italy to acknowledge indirect

control by Chem China in Pirelli's 2017 Annual Report:

> Neither the Italian Finance Code (Art. 93 TUF) or the dictates of Italian
> Finance Code (TUF D. Lgs. 58/1998) are on the record of this review.
> As such, we are not convinced that Pirelli [Italy] must report that it is
> controlled by Chem China mainly for accounting purposes pursuant to
> the Italian Finance Code (Art. 93 TUF) or the dictates of Italian Finance
> Code (TUF D. Lgs. 58/1998).

Id. at 16.  In both instances, Commerce refused to consider Pirelli's arguments

based on provisions of Italian law that were not included on the record.

Commerce has discretion in the manner in which it conducts its

administrative proceedings.  See PSC VSMPO-Avisma Corp. v. United States, 688

F.3d 751, 760 (Fed. Cir. 2012); see also Yantai Timken Co., Ltd. v. United States,

31 CIT 1741, 1755, 521 F. Supp. 2d 1356, 1370 (2007) ("Commerce has broad

discretion to establish its own rules governing administrative procedures . . .").

"Commerce's role in an administrative proceeding is to weigh the evidence

established in the record."  Yantai CMC Bearing Co., 41 CIT at __, 203 F. Supp.

3d at 1324.  The respondent bears the burden of creating the record for

Commerce's review.  Id.  Pirelli did not provide to Commerce the relevant portions

of Italian law on which its arguments relied.  In this case, the Court concludes that

Commerce's rejection of Pirelli's unsupported interpretations of Italian law was

reasonable.

## II.   Whether Commerce's Determination was Supported by Substantial Evidence

Plaintiffs argue that Commerce's determination that Pirelli failed to rebut the

presumption of *de facto* government-control is not supported by substantial

evidence.  Pls.' Br. at 23–49.  Specifically, Plaintiffs contend that Commerce's

determination that the Pirelli Group's shareholder structure allowed the

government-controlled minority owners to assert control over Pirelli China's

operational activities was not supported by substantial evidence.  Pls.' Br. at 25–

31.  Plaintiffs argue that Commerce's determination that government-controlled

minority shareholders were able to influence Pirelli China's export activities was

unsupported by substantial evidence.  Id. at 46–49.  In addition, Plaintiffs argue

that Commerce ignored contrary record evidence that Pirelli China's day-to-day

operations were insulated from shareholder control.  Id. at 32–44.  Plaintiffs

contend that Commerce unreasonably ignored provisions of Italian law in reaching

its determination.  Id. at 44–46.

Because China is a nonmarket economy, Commerce employs a rebuttable

presumption that all companies operating in China are subject to government-

control unless an individual exporter can demonstrate its *de facto* and *de jure*

independence from the government.  19 U.S.C. § 1677(18); <u>Sigma Corp.</u>, 117 F.3d

at 1405.  As discussed above, Commerce denied Pirelli separate rate status based

on the third factor of the *de facto* government test and determined that Pirelli had

not rebutted the presumption as to its autonomy from government control over the

selection of management.  Final IDM at 13–18.

Based on a review of Pirelli's Corporate Organization Chart in evidence,

Commerce determined that under Pirelli's organizational structure for most of

Period of Review 3, Chem China and the Silk Road Fund, two Chinese

government-owned entities, jointly controlled 36.9 percent of Pirelli China.  <u>Id.</u> at

14; Pls.' Separate Rate App. at Ex. 5 ("Pirelli's Corporate Organization Chart"),

PJA 4, CJA 2.  Because these state-owned entities accounted for only minority

indirect ownership of Pirelli China, Commerce looked for additional indicia of

government-control.  Final IDM at 15; <u>see</u> <u>An Giang Fisheries Imp. & Exp. Joint</u>

<u>Stock Co.</u>, 42 CIT at __, 284 F. Supp. 3d at 1359.

Commerce examined Pirelli's Separate Rate Application on the record as

additional indicia of government-control and determined based on this evidence

that Pirelli Italy was the indirect majority shareholder of Pirelli China and selected

members of Pirelli China's Board of Directors.  Final IDM at 15, 17; Pls.' Separate

Rate App. at 23–24.  Based on a review of Plaintiffs' separate rate application,

Commerce also determined that during Period of Review 3, Pirelli Italy and Chem

China shared a common chairperson.  Final IDM at 15; Pls' Separate Rate App. at

Ex. 16D ("Pirelli Italy's Board of Directors and Key Managers Info."), PJA 10,

CJA 8.  Citing the Pirelli Group's 2017 Annual Report, Commerce determined that

Chem China was the largest individual shareholder of Pirelli Italy and the only

party to hold more than three percent of Pirelli Italy's shares.  Final IDM at 15–16;

Pirelli Group's 2017 Annual Report at 231.  Despite Pirelli's argument that a

majority of Pirelli Italy's Board of Directors members held no office with Chem

China or China National Tire & Rubber Corporation, Ltd. and that a minority of

Pirelli Italy's Board of Directors members were Chinese nationals, Commerce

determined that Pirelli's corporate documents demonstrated to the contrary that

China National Tire & Rubber Corporation, Ltd. (a Chinese government-controlled

entity) was involved in the selection of a majority of Pirelli Italy's Board of

Director's members.  Final IDM at 16–17; Pirelli's 2017 Shareholders Agreement

§ 4.2.2.

Pirelli contends that certain Board of Directors members were free from

government influence because they were designated as "independent" under

provisions of Italian corporate law, which Commerce noted were not submitted on

the administrative record.  Pls.' Br. at 28–31, 44; Final IDM at 17.

Notwithstanding whether Plaintiff should have been required to place the Italian

law provisions on the record, the Court concludes that Commerce's rejection of

Pirelli's argument that Pirelli Italy's directors should be deemed "independent"

under Italian law was reasonable, particularly because such designation as

"independent" under Italian law would not be dispositive in this case, and because

Commerce sufficiently cited substantial evidence on the record such as the separate

rate application, the 2017 Annual Report, and the 2017 corporate by-laws to

support Commerce's determination that Pirelli Italy was still under Chinese-

government control.  For example, citing language in the Pirelli Group's 2017

Annual Report, Commerce determined that Pirelli Italy had not established its

independence from government-controlled entities.  Id. at16.  Commerce quoted

the 2017 Annual Report that stated: "[Pirelli Italy was] directly controlled by

Marco Polo International Italy S.p.A. . . . and [was] in turn therefore indirectly

controlled by [Chem China], a state-owned enterprise [] governed by Chinese law

with registered office in Beijing, and which report[ed] to the Central Government

of the People's Republic of China."  Id. at 16 (quoting Pirelli Group's 2017 Annual

Report at 300).  The Pirelli Group's 2017 Annual Report also stated that Pirelli

Italy was "indirectly controlled, pursuant to art. 93 [Italian Finance Code], by

Chem China via [China National Tire & Rubber Corporation, Ltd.] and certain of

its subsidiaries, including Marco Polo."  Id. (quoting Pirelli Group's 2017 Annual

Report at 205).  The Court observes that because Pirelli's own 2017 Annual Report

confirmed that Pirelli Italy was indirectly controlled by Chem China, a Chinese

government-controlled entity, via China National Tire & Rubber Corporation,

another Chinese government-controlled entity, Commerce's determination that

Pirelli Italy was indirectly controlled by Chinese government entities is supported

by substantial evidence.

Commerce rejected Plaintiffs' argument that Pirelli Italy's CEO, Marco

Tronchetti Provera, had exclusive authority to select Pirelli Italy's management

and was insulated from the influence of Board of Directors members.  Final IDM

at 17; Pls.' Br. at 34–37.  Rather, Commerce determined based on a review of

Pirelli's 2017 By-laws on the record that Pirelli Italy was managed by its Board of

Directors and that Provera reported to the Board of Directors and derived his

authority from the Board of Directors.  Final IDM at 17; Pirelli's 2017

Shareholders' Agreement § 4.4 ("The Pirelli CEO and Executive Chairman shall

be *delegated* the exclusive power and authority concerning the ordinary

management of Pirelli and of the Pirelli Group"); Pls.' Separate Rate App. at Ex.

10B ("Pirelli's 2017 By-laws") § 10.1, PJA 8, CJA 6 ("The Company shall be

managed by a Board of Directors composed of up to fifteen members who shall

remain in office for three financial years and may be re-elected."); see also Pirelli's

2017 Shareholders' Agreement § 4.7.  The Court also notes that based on Pirelli's

Separate Rate Application and a Letter of Appointment of Pirelli China's

Directors, Commerce determined that Pirelli Italy indirectly owned shares of Pirelli China and that Pirelli Italy had the ability to appoint members of Pirelli China's Board of Directors.  Final IDM at 17; Pls.' Separate Rate App. at 24; Pls.' Separate Rate App. at Ex. 16A ("Pirelli's Letter of Appointment of Pirelli China's Directors"), PJA 9, CJA 7.  The Court agrees that Commerce's determination was reasonable because these documents established that the Board of Directors could be appointed by entities within Chinese government control.

The Court concludes that substantial evidence supports Commerce's determination that Pirelli failed to rebut the presumption of *de facto* government control.  The Court sustains Commerce's assignment of the China-wide entity rate to Pirelli.

## CONCLUSION

For the foregoing reasons, the Court concludes that Commerce's determination that New Continent provided accurate information during the administrative review was supported by substantial record evidence.  The Court also concludes that Commerce's assignment of the China-wide entity rate to Pirelli was in accordance with the law and supported by substantial record evidence.  The

Court sustains the <u>Final Results</u> and <u>Remand Results</u>.  In accordance with this

opinion, judgment will be entered.


                                                        <u>   /s/ Jennifer Choe-Groves   </u>
                                                          Jennifer Choe-Groves, Judge


Dated:   <u>   March 20, 2023      </u>
                New York, New York